88 F.3d 729
 65 USLW 2055, 24 Media L. Rep. 2072,
96 Cal. Daily Op. Serv. 4944,
96 Daily Journal D.A.R. 7982
 William BLAND and National Association of Telecomputer
Operators, Plaintiffs-Appellants,
v.
Daniel Wm. FESSLER; P. Gregory Conlon; Norman D. Shumway;
Jessie J. Knight Jr.; and Patricia M. Eckart, in their
individual and official capacities as Public Utilities
Commissioners, and Daniel E. Lungren, in his official
capacity as Attorney General of the State of California,
Defendants-Appellees.
 No. 95-55522.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 17, 1995.
Decided July 2, 1996.
 
 Rex S. Heinke, Los Angeles, California, for plaintiffs-appellants.
 Ronald A. Reiter, Los Angeles, California, and Mark Fogelman, San Francisco, California, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California, Edward Rafeedie, District Judge, Presiding. D.C. No. CV-94-07275-ER.
 Before: FLETCHER, CANBY, and HAWKINS, Circuit Judges.
 ORDER
 The opinion filed April 1, 1996, Slip op. 3923, is withdrawn.
 OPINION
 FLETCHER, Circuit Judge:
 
 
 1
 Plaintiffs appeal the grant of summary judgment dismissing their action against the Commissioners of the California Public Utilities Commission and the dismissal on a Rule 12(b)(6) motion of their action against the Attorney General of California. Plaintiffs' action challenges on First Amendment grounds two California statutes that regulate Automatic Dialing and Announcing Devices ("ADADs"), machines that dial telephone numbers and deliver prerecorded messages. We affirm.I. FACTS AND PRIOR PROCEEDINGS
 
 
 2
 William Bland used ADADs to advertise his carpet cleaning services. Bland's ADADs provoked consumer complaints to the telephone company. One telephone user reported he could not terminate calls from Bland's ADADs: "I hung up my telephone several times, but the recording continued and tied up my line for at least a couple of minutes." This consumer also complained that Bland's ADADs were extremely misleading as to the identity of the calling party. In May 1994, the telephone company notified Bland that his use of ADADs violated California law and threatened to disconnect his telephones if he didn't stop using them. Bland immediately stopped using his ADADs.
 
 
 3
 Two California statutes prohibit the use of ADADs unless a live operator first identifies the calling party and obtains the called party's consent to listen to the prerecorded message. Cal. Pub. Util.Code § 2874(a) ("the utilities statute");[1] Cal. Civ.Code § 1770(v)(1) ("the civil statute").[2] The California Public Utilities Commission may enforce the utilities statute with fines and the disconnection of telephone service. Cal. Pub. Util.Code § 2876. The California Attorney General may enforce the civil statute with fines, Cal. Bus. & Prof.Code § 17200 et seq., and citizens injured by violations of the civil statute may file suit for damages, Cal. Civ.Code §§ 1780-1784. The utilities statute applies to all ADAD users, subject to exceptions; the civil statute applies only to commercial users of ADADs.
 
 
 4
 The State of California is not alone: Congress has also restricted the use of ADADs, 47 U.S.C. § 227 (the Telephone Consumer Protection Act of 1991), as have more than forty states, S.Rep. No. 102-178, 102d Cong., 1st Sess. (1991), reprinted in 1991 U.S.C.C.A.N.1968, 1970. ADADs are common; hundreds of thousands of solicitors have used them to contact millions of people. Id. The California legislature found that "[u]nsolicited prerecorded calls are a source of great aggravation to many people, interrupting their affairs and tying up their lines." Cal. Sen. Judiciary Comm., Hearing Report on AB 4084 of June 19, 1990, at 2. Congress found that ADAD calls are annoying and disruptive in the following ways:
 
 
 5
 . automated calls are placed to lines reserved for emergency purposes, such as hospitals and fire and police stations;
 
 
 6
 . the entity placing the automated call does not identify itself;
 
 
 7
 . the automated calls fill the entire tape of an answering machine, preventing other callers from leaving messages;
 
 
 8
 . the automated calls will not disconnect the line for a long time after the called party hangs up the phone, thereby preventing the called party from placing his or her own calls;
 
 
 9
 . automated calls do not respond to human voice commands to disconnect the phone, especially in times of emergency;. some automatic dialers will dial numbers in sequence, thereby tying up all the lines of a business and preventing any outgoing calls; and
 
 
 10
 . unsolicited calls placed to fax machines, and cellular or paging telephone numbers often impose a cost on the called party....
 
 
 11
 S.Rep. No. 102-178, reprinted in 1991 U.S.C.C.A.N. at 1969.
 
 
 12
 In October 1994, Bland and the National Association of Telecomputer Operators ("NATO")[3] sued the Commissioners and the Attorney General of California in federal district court, alleging that both of California's ADAD statutes violate the First and Fourteenth Amendments to the United States Constitution. In March 1995, the court upheld both statutes, granting the Commissioners' motion for summary judgment pursuant to Rule 56, and granting the Attorney General's motion to dismiss pursuant to Rule 12(b)(6). Plaintiffs appeal. The Attorney General urges on appeal that the dismissal of the action against him should have been for lack of standing, rather than for failure to state a claim.[4]
 
 II. DISCUSSION
 
 13
 The appeal presents three questions. First, is the utilities statute constitutional? Second, do the plaintiffs have standing to challenge the civil statute?[5] Third, is the civil statute constitutional?
 
 A. THE UTILITIES STATUTE
 
 14
 Plaintiffs argue that the utilities statute violates the First Amendment. We review determinations as to the constitutionality of a statute de novo. Gray v. First Winthrop Corp., 989 F.2d 1564, 1567 (9th Cir.1993).
 
 
 15
 Two recent decisions guide our analysis: this court's Moser v. FCC, 46 F.3d 970 (9th Cir.1995), and the Eighth Circuit's Van Bergen v. Minnesota, 59 F.3d 1541 (8th Cir.1995), both of which upheld ADAD statutes as permissible time, place, and manner restrictions on speech. Moser concerned a federal ADAD statute, 46 F.3d at 972 (considering 47 U.S.C. § 227), and Van Bergen concerned a Minnesota ADAD statute, 59 F.3d at 1544-45 n. 2 (considering Minn.Stat. §§ 325E.26-.31). Both statutes resemble the statute at bar.
 
 
 16
 The plaintiffs argue that two different decisions ought to guide our analysis: Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), and Project 80's, Inc. v. City of Pocatello, 942 F.2d 635 (9th Cir.1991), both of which struck down statutes prohibiting door-to-door solicitation. We find Martin and Project 80's inapposite for two reasons.
 
 
 17
 First, compared to door-to-door solicitors, the annoyance and disruption of ADADs is of a different order of magnitude. As the Eighth Circuit explained, ADAD calls create a much greater problem because of their "sheer quantity" and the fact that they offer recipients who want to hang up immediately no opportunity to tell the caller not to call again. Van Bergen, 59 F.3d at 1555. Moreover, while door-to-door solicitation involves a conversation between two people, ADADs involve a one-way onslaught of information. Indeed, Congress determined that ADAD calls are "more of a nuisance and a greater invasion of privacy" than telemarketing with live operators, as ADADs "cannot interact with the customer except in preprogrammed ways" and "do not allow the caller to feel the frustration of the called party...." S.Rep. No. 102-178, reprinted in 1991 U.S.C.C.A.N. at 1972. ADADs are less like door-to-door solicitation and more like sound trucks and public address systems, both of which the government may regulate. Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (plurality opinion) (sound trucks); Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (public address systems).
 
 
 18
 Second, while the statutes in Martin and Project 80's prohibited essentially all door-to-door solicitation,[6] whether or not a homeowner wanted to speak to a solicitor, the statute at bar permits the use of ADADs, so long as the called party consents to listen to the prerecorded message. Central to the door-to-door solicitation decisions were concerns over the dangers of state paternalism that deprives people of information they might wish to receive. Martin, 319 U.S. at 141, 63 S.Ct. at 862 (solicitation should "depend upon the will of the individual master of each household, and not upon the determination of the community"); Project 80's, 942 F.2d at 638-39. In contrast, the California statute makes no decisions for the called parties who remain free to decide for themselves whether or not to listen to prerecorded messages.
 
 
 19
 Thus, Moser and Van Bergen inform our inquiry, and not Martin and Project 80's. However, neither the federal ADAD statute upheld in Moser nor the Minnesota ADAD statute upheld in Van Bergen is identical to the California statute. The federal statute regulates only calls to residences, while the California statute regulates calls to both residences and businesses. Although Minnesota's statute applies to both residences and businesses, its exemptions are different. Accordingly, we must apply discretely to the California statute the time, place, and manner test, to determine whether its particular restrictions 1) are content neutral, 2) serve a significant governmental interest, 3) are narrowly tailored to serve this interest, and 4) leave open ample alternative channels of communication. Ward, 491 U.S. at 791, 109 S.Ct. at 2753-54 (citations omitted).
 
 1. Content Neutrality
 
 20
 For the purposes of analysis, the utilities statute can be divided into its central prohibitory provision and its exemptions.
 
 
 21
 The statute forbids the use of ADADs unless preceded by a live operator who identifies the calling party and obtains the called party's consent to listen to the prerecorded message. Cal. Pub. Util.Code § 2874(a). This provision simply prescribes a method of communication, not its content. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791, 109 S.Ct. at 2753-54.
 
 
 22
 The statute contains two kinds of exemptions, both of which are content neutral. The statute has a global exemption for parties with an existing relationship: "This article does not apply to any [ADAD] ... that is used solely to transmit a message to an established business associate, customer, or other person having an established relationship with the person using the [ADAD]...." Cal. Pub. Util.Code § 2872(f). The statute also exempts calls from nonprofit organizations to their members. Id. at § 2872(d)(2). These exemptions rest not on the content of the message, but on existing relationships implying consent to the receipt of ADAD calls. See Van Bergen, 59 F.3d at 1550 (upholding exemption where "the caller has a relationship with the subscriber implying the subscriber's consent to receive the caller's communications").
 
 
 23
 Other exemptions do relate to content, some involving existing relationships, others not. The statute exempts calls 1) from schools to parents regarding student attendance, 2) from cable and utility companies to customers regarding previously arranged installation of facilities, 3) from petroleum, chemical, and nuclear facilities concerning emergencies, and 4) from police and fire officials concerning public safety and emergencies. Cal. Pub. Util.Code § 2872(d), (e). Although regulating content, all of these exemptions are based on relationships implying consent to receive ADAD calls, or messages the recipient wants to hear, or both: parents want to know of their children's attendance, consumers of cable and utility services want installation information, and everyone wants information concerning public safety and emergencies.
 
 
 24
 Plaintiffs, however, argue that these exemptions improperly privilege some relationships over others. We disagree. The statute exempts ADAD communications between all persons and entities with established relationships. That it exempts some emergency situations and callers but not others[7] is not a fatal flaw. Underinclusiveness of the emergency exemptions cannot possibly indicate a preference for one side of a debate over the other.
 
 
 25
 Plaintiffs also argue that the group-based exemptions improperly contain content-based restrictions. However, the "principal inquiry" in content neutrality cases is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward, 491 U.S. at 791, 109 S.Ct. at 2753-54 . Not a scintilla of evidence suggests that the State of California disapproves of parent-teacher communication regarding student grades, as opposed to the communication about student attendance that the statute permits. Nor do the restrictions on the content of the messages the other exempted groups may convey--cable companies may call only regarding previously arranged service installation, and dangerous facilities may call only regarding disasters--carry the scent of government favoritism in the free market of ideas.
 
 2. The Government Interests
 
 26
 The State of California has a significant interest in protecting the public from ADAD calls, whether received at home or at work. ADADs can generate an incredible volume of prerecorded telephone calls: "Certain data indicate that the machines are used by more than 180,000 solicitors to call more than 7 million Americans every day. Each [ADAD] has the capacity to dial as many [as] 1,000 telephone numbers each day." S.Rep. No. 102-178, reprinted in 1991 U.S.C.C.A.N. at 1970. Bland's two ADADs, which deliver 60-second messages for twelve hours a day, Declaration of William Bland of Oct. 22, 1994, at 2-3, could call in excess of a half million telephones a year. Such calls, received at either residences or places of business, have the potential to annoy and disrupt.[8]
 
 
 27
 The Minnesota Supreme Court described the threat posed by telephone solicitation to residential privacy as follows:
 
 
 28
 the residential telephone is uniquely intrusive. The caller ... is able to enter the home for expressive purposes without contending with such barriers as time or distance, doors or fences.... Unlike the unsolicited bulk mail advertisement found in the mail collected at the resident's leisure, the ring of the telephone mandates prompt response, interrupting a meal, a restful soak in the bathtub, even intruding on the intimacy of the bedroom.
 
 
 29
 State by Humphrey v. Casino Marketing Group, 491 N.W.2d 882, 888 (Minn.1992), cert. denied, 507 U.S. 1006, 113 S.Ct. 1648, 123 L.Ed.2d 269 (1993). This court likewise concluded that "Congress accurately identified automated telemarketing calls as a threat to privacy." Moser, 46 F.3d at 974.
 
 
 30
 The State of California's significant interest in protecting residential privacy is well established. "The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." Frisby v. Schultz, 487 U.S. 474, 484, 108 S.Ct. 2495, 2502, 101 L.Ed.2d 420 (1988) (citations omitted). The Supreme Court has repeatedly upheld against First Amendment challenge speech restrictions that seek to protect residential privacy. Id. (upholding residential picketing ban); FCC v. Pacifica Foundation, 438 U.S. 726, 748, 98 S.Ct. 3026, 3039-40, 57 L.Ed.2d 1073 (1978) (upholding FCC prohibition of indecent speech on the airwaves); Rowan v. Post Office Dept., 397 U.S. 728, 736-37, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970) (upholding postal regulation of offensive mail); Kovacs, 336 U.S. at 88-89, 69 S.Ct. at 454-55 (upholding sound truck ban).[9]
 
 
 31
 The State of California's significant interest in protecting the public from ADADs does not end when telephone users leave their homes. ADADs are "a source of great aggravation to many people, interrupting their affairs and tying up their lines." Cal. Sen. Judiciary Comm., Hearing Report on Assembly Bill 4084 of June 19, 1990, at 2. People receiving ADAD calls are no less aggravated because they are at work and not at home. In residences and in workplaces, ADADs tie up lines, fill up answering machines, and impose costs on the called parties. S.Rep. No. 102-178, reprinted in 1991 U.S.C.C.A.N. at 1970. Indeed, "business subscribers believe that these calls are an impediment to interstate commerce." Id. at 1969.
 
 
 32
 The State of California's significant interest in protecting people at work from the annoyance and disruption of ADADs is well grounded in law. The Eighth Circuit held in Van Bergen that
 
 
 33
 individuals at work in private businesses are entitled to expect that they will not be disturbed except by personal or business invitees, just as, at their residence, they are entitled to expect privacy. Cf. Mancusi v. De Forte, 392 U.S. 364, 369 (1968) (holding that the occupant of an office has standing to challenge warrantless search of his office because entitled to expect only invitees to enter his office).
 
 
 34
 59 F.3d at 1554 (full citation omitted).[10] Moreover, speakers have no right to turn people who are outside of their homes into a "captive audience" that is "incapable of declining to receive" a message. Lehman v. City of Shaker Heights, 418 U.S. 298, 307, 94 S.Ct. 2714, 2719, 41 L.Ed.2d 770 (1974) (Douglas, J., concurring) (upholding a ban on political advertisements on car cards on buses because commuters are a captive audience). The Minnesota Supreme Court has noted that ADADs turn telephone users into a "captive audience." Casino Marketing, 491 N.W.2d at 889.
 
 3. Narrowly Tailored
 
 35
 The utilities statute substantially promotes the government's interest in protecting telephone users at home and at work from the annoyance and disruption of ADAD calls. By requiring ADAD users to obtain the called party's consent before playing a prerecorded message, the statute allows telephone users to avoid ADAD messages they don't want to hear, and prevents the problems caused by unregulated ADADs (e.g., filled-up answering machines, failures to disconnect, tied-up lines, and attendant costs and inconveniences imposed on called parties).
 
 
 36
 The statute is narrowly tailored to achieve its goals. While time, place, and manner restrictions on speech that "disregard far less restrictive and more precise means are not narrowly tailored," Project 80's, 942 F.2d at 638, they need not be "the least restrictive or least intrusive means" of accomplishing the government's goals. Ward, 491 U.S. at 798, 109 S.Ct. at 2757-58.
 
 
 37
 Here, no less restrictive means of accomplishing the government's objectives is readily apparent. Neither alternative strategy proposed by the plaintiffs--"do not call" lists and self-help--can effectively protect privacy in the home and workplace. A "do not call" list would place the burden on the public to stop disruptive ADAD calls from arriving at homes and places of work. Moreover, a "do not call" list would force people to make an all-or-nothing choice about prerecorded messages, while California's statute allows people to choose to hear some but to reject others.
 
 
 38
 The plaintiffs also suggest that the state government eschew legislation and allow people to protect themselves from ADADs as they see fit by turning off their ringers, screening their calls with answering machines, or by simply hanging up on prerecorded calls. However, self-help is no substitute for the statute's protections. Turning off ringers forces people into isolation. Screening is not available to people too poor to afford an answering machine and would clutter the machines of those who can afford them. Hanging up does not allow the called party to tell the caller not to call again and does not always disconnect the call.
 
 4. Alternative Channels of Communication
 
 39
 The utilities statute leaves ample alternative channels free to the public to disseminate messages through the use of handbills, bill boards, magazines, newspapers, television, radio, telemarketing, and even ADADs introduced by a live operator.
 
 
 40
 Bland claims that no other means of advertising is remotely as effective as ADADs, that the utilities statute is destroying his business and forcing him to lay off his employees, and that the live operator requirement drives up the cost of using an ADAD from less than $2,000 to more than $50,000. Even if these claims are credited, the fact that "more people may be more easily and cheaply reached" by a particular method of speech is not the test. Kovacs, 336 U.S. at 88-89, 69 S.Ct. at 454-55.
 
 B. THE CIVIL STATUTE
 
 41
 We address first the Attorney General's challenge to plaintiffs' standing, and then address the civil statute's constitutionality.
 
 1. Standing
 
 42
 We review standing de novo. Hong Kong Supermarket v. Kizer, 830 F.2d 1078, 1080 (9th Cir.1987).
 
 
 43
 "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308-09, 60 L.Ed.2d 895 (1979) (citation omitted). However, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." Id. (citation omitted).[11] That one should not have to risk prosecution to challenge a statute is especially true in First Amendment cases, "[f]or free expression--of transcendent value to all society, and not merely to those exercising their rights--might be the loser." Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120-21, 14 L.Ed.2d 22 (1965).
 
 
 44
 Bland has suffered injury. He once used ADADs without live-operator introductions, conduct proscribed by both the civil and utilities statutes. Although, in fact, he stopped because of the telephone company's threat, he is also under the cloud of the civil statute's penalties. Bland claims that he cannot afford to hire live operators. Declaration of William Bland of Oct. 22, 1994, at 4. The civil statute thus places Bland between the rock of foregoing the use of his ADADs and the hard place of violating the law. He claims that his compliance with the civil statute has cut his income by 50% and caused him to lay off three employees. Id. Had he chosen to violate the civil statute, he would have run a substantial risk of civil fines and private enforcement actions.
 
 
 45
 While the Attorney General has never enforced the civil statute against anyone,
 
 
 46
 [w]e are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without actual prosecution.
 
 
 47
 Virginia v. American Booksellers Ass'n, 484 U.S. 383, 393, 108 S.Ct. 636, 643, 98 L.Ed.2d 782 (1988) (emphasis added). See also Mobil Oil Corp. v. Attorney General of the Commonwealth of Virginia, 940 F.2d 73, 76 (4th Cir.1991) (plaintiff has standing where "the Attorney General has not ... disclaimed any intention of exercising her enforcement authority"); KVUE, Inc. v. Moore, 709 F.2d 922, 930 (5th Cir.1983) (plaintiff has standing where "[t]he state has not disavowed enforcement"), aff'd, 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984).
 
 
 48
 The Attorney General of California has not stated affirmatively that his office will not enforce the civil statute.[12] Indeed, the Attorney General sponsored the bill that became the civil statute, Cal. Ass. Utilities and Commerce Comm., Hearing Report on AB 4084 of May 7, 1990, at 2, the California legislature intended the Attorney General to enforce the civil statute, Cal. Sen. Judiciary Comm., Hearing Report on AB 4084 of June 19, 1990, at 3, and the Attorney General has the power to enforce the civil statute, Cal. Bus. & Prof.Code §§ 17200 et. seq. Moreover, the civil statute, which has been on the books for only six years, has not fallen into desuetude. See San Francisco County Democratic Cent. Comm. v. Eu, 826 F.2d 814, 821-822 (9th Cir.1987), aff'd, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989).
 
 
 49
 Bland chose to obey both the civil and utilities statutes and to bring a declaratory action challenging their constitutionality, rather than to violate the law, await an enforcement action against him, and raise the statutes' constitutionality as a defense. Bland's decision was altogether reasonable and demonstrates a commendable respect for the rule of law. Under the circumstances of this case, Bland should be allowed to test the law. See Mobil Oil, 940 F.2d at 75 ("Public policy should encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution.").
 
 
 50
 The Attorney General argues in the alternative that an order by this court, a federal court, striking down a state statute will not remedy the injury to Bland because this court cannot stop California's consumers from enforcing the civil statute against Bland in the California courts. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351 (1992) (no standing unless a favorable decision will likely remedy the injury). The Attorney General notes that consumers have the power to enforce the civil statute, Cal. Civ.Code §§ 1780-1784, and that California's courts have held that they are not bound by lower federal court interpretations of the United States Constitution, People v. Bradley, 1 Cal.3d 80, 81 Cal.Rptr. 457, 460, 460 P.2d 129, 132 (1969) (en banc) ("we are not bound by the decisions of the lower federal courts even on federal questions"); People v. Perez, 229 Cal.App.3d 302, 279 Cal.Rptr. 915, 919 (1991) (citing Bradley to reject federal appeals court decisions regarding the Sixth Amendment).
 
 
 51
 We voiced "serious doubts" about the argument that state courts may ignore the decisions of federal circuit courts on federal questions in Yniguez v. State of Arizona, 939 F.2d 727, 736 (9th Cir.1991), aff'd in part, rev'd in part sub nom. Yniguez v. Arizonans for Official English, 42 F.3d 1217 (9th Cir.1995), aff'd upon reh'g, 69 F.3d 920 (9th Cir.1995) (en banc), cert. granted, --- U.S. ----, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996). There, a party argued that the interests of two proposed Rule 24(a) intervenors were not practically impaired because they could relitigate the federal constitutional questions in the Arizona state courts. 939 F.2d at 735-36. We criticized this argument, noting 1) the likelihood that Congress intended the federal courts "to have the final word on questions of federal law," 2) the dangers of "considerable friction between the state and federal courts as well as duplicative litigation," and 3) the fact that "for so many years a right of appeal to the Supreme Court was provided in all cases in which federal circuit courts held state statutes unconstitutional." Id. at 736-37.
 
 
 52
 We do not now reach this question. However, even if the Attorney General is correct, an order by this court striking down the civil statute would certainly help redress Bland's injury. Of Bland's potential legal adversaries, the Attorney General of California has far and away the greatest resources, both economic and political. The doctrine of claim preclusion would preclude the Attorney General from relitigating the constitutionality of the civil statute against Bland, in either state or federal court. Were we to find the statute unconstitutional, it would be of immense benefit to Bland. See Yniguez, 939 F.2d at 737 ("While [an order striking down a statute] may have left [private parties'] right to sue intact, a right to bring a private enforcement action is not a complete substitute for executive enforcement and implementation. Hence, as a practical matter, the [order] substantially weakened [the statute]....").
 
 
 53
 The Fourth Circuit reached a similar conclusion in a similar case. In Mobil Oil, a company sued the Attorney General of Virginia to challenge the constitutionality of a new statute, and the Attorney General argued that private enforcement provisions in the statute prevented standing. 940 F.2d at 76. The court rejected this argument, reasoning that the possibility of a dispute between the company and private parties "does not bear on whether [the company] has a dispute with the Attorney General," and noting the likelihood that the Attorney General would intervene in any private litigation to defend the constitutionality of the statute. Id. at 76-77.
 
 
 54
 2. The Constitutionality of the Civil Statute
 
 
 55
 Much of our earlier analysis with respect to the utilities statute is applicable here, but there are differences between the statutes. Particularly, while the utilities statute affects (with exceptions) all users of ADADs, the civil statute restricts only commercial speech. Communication that "does no more than propose a commercial transaction" is commercial speech. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825-26, 48 L.Ed.2d 346 (1976) (quoting Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558-59, 37 L.Ed.2d 669 (1973)). The civil statute regulates only speech that proposes a commercial transaction. See Cal. Civ.Code § 1770 ("The following ... acts ... undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful....").
 
 
 56
 While the First Amendment protects commercial speech, Virginia Pharmacy, 425 U.S. at 762, 96 S.Ct. at 1825-26, it "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression," Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). Since we find constitutional the utilities statute that is more broadly applicable, i.e., to all users of ADADs (except for special exemptions), we need not indulge in a discussion of the possible erosion of the Central Hudson doctrine. By definition, if the utilities statute is constitutional, so too is the civil statute.
 
 
 57
 Like the utilities statute, the California legislature intended the civil statute to protect the people of California from "intrusive telephone marketing schemes," noting that unsolicited ADAD calls cause "great aggravation to many people, interrupting their affairs and tying up their lines." Cal. Sen. Judiciary Comm., Hearing Report on Assembly Bill 8084 of June 19, 1990, at 2. Beyond the protection of privacy interests, the civil statute is concerned as well with the prevention of additional evils: "unfair methods of competition" and "deceptive acts" in the commercial context. Cal. Civ.Code § 1770.[13]
 
 
 58
 Clearly, the civil statute satisfies Central Hudson 's requirement that "the regulation directly advance[ ] the governmental interest asserted," 447 U.S. at 566, 100 S.Ct. at 2351. "[T]he fit between the governmental interest and the legislative means chosen to promote it 'need not be perfect, but simply reasonable.' " Association of Nat'l Advertisers, Inc. v. Lungren, 44 F.3d 726, 732 (9th Cir.1994) (quoting Association of Nat'l Advertisers, Inc. v. Lungren, 809 F.Supp. 747, 757 (N.D.Cal.1992)), cert. denied, --- U.S. ----, 116 S.Ct. 62, 133 L.Ed.2d 25 (1995).
 
 
 59
 The Supreme Court's recent decision in Rubin v. Coors Brewing Co., --- U.S. ----, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995), does not affect the analysis of this case. There, the Supreme Court held that a ban on the display of alcohol content on beer labels did not directly advance the government's goal of suppressing alcohol strength wars. The Court reasoned that "the irrationality of this unique and puzzling regulatory framework"--the law failed to address any other beer advertisements or any aspect of wine and spirits--"ensures that the labeling ban will fail...." Id. at ----, 115 S.Ct. at 1593. Here, while the civil statute allows ADAD calls between parties with an existing relationship and does not address other forms of telemarketing, it will effectively protect the public from unwanted and unsolicited ADAD calls, which the California legislature not unreasonably found to be unfair competition, deceptive, and uniquely annoying and disruptive.
 
 III. CONCLUSION
 
 60
 We affirm. The plaintiffs have standing to challenge the civil statute. Both the utilities and civil statutes are constitutional on their faces and as applied.
 
 
 
 [1]
 The utilities statute, which exempts calls between parties with an existing relationship and calls from schools, nonprofit organizations, utilities, and public-safety officials, see infra, provides:
 Whenever telephone calls are placed through the use of an automatic dialing-announcing device, the device may be operated only after an unrecorded, natural voice announcement has been made to the person called by the person calling. The announcement shall do all of the following:
 (1) State the nature of the call and the name, address, and telephone number of the business or organization being represented, if any.
 (2) Inquire as to whether the person called consents to hear the prerecorded message of the person calling.
 
 
 [2]
 The civil statute, which also exempts calls between parties with an established relationship, provides:
 The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
 ...
 Disseminating an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message.
 
 
 [3]
 NATO is a nonprofit corporation whose members advertise their products or services by telephone
 
 
 [4]
 The Attorney General moved to dismiss under Rule 12(b)(6). However, he argued both jurisdictional bar and failure to state a claim. The latter is properly brought under Rule 12(b)(6). The former apparently is amenable to dismissal only under Rule 12(b)(1) in this circuit. See Gemtel Corp. v. Community Redevelopment Agency, 23 F.3d 1542, 1544 n. 1 (9th Cir.1994) (mootness and ripeness properly challenged under Rule 12(b)(1)); but see generally 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1360, at 435-37 (2d ed.1990) (courts are not uniform in this view)
 The district judge stated "the claim that there is no justiciable case or controversy is not well taken. There is a case or a controversy sufficient to request declaratory relief." However, because the judge had found the utilities statute constitutional and concluded that the civil statute was substantially the same, he ruled that no claim could be stated against the Attorney General. He therefore dismissed the civil statute claim under Rule 12(b)(6).
 
 
 [5]
 None of the defendants argue that the plaintiffs lack standing to challenge the utilities statute, violations of which by Bland the telephone company invoked as a threat to cut off Bland's service if he did not terminate the use of ADADs
 
 
 [6]
 Both statutes in Project 80's exempted "requested or invited" solicitors and one of them (the Pocatello ordinance) exempted persons who solicit donations for charities or nonprofit organizations. Project 80's, 942 F.2d at 636-37
 
 
 [7]
 Plaintiffs suggest, for example, that munitions facilities are not exempted
 
 
 [8]
 Because we conclude that the protection of privacy is a sufficiently significant governmental interest to justify the statute, we need not address plaintiffs' arguments with respect to other rationales
 
 
 [9]
 Plaintiffs invoke Carey v. Brown, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (striking down residential picketing ban that exempted labor pickets), for the proposition that the utilities statute's exemptions undermine its privacy rationale. Carey is inapposite. While pickets disrupt privacy and union pickets disrupt residential privacy as much as pickets by other groups, ADAD calls' disruption of privacy are of a different magnitude. Moreover, the guiding principles in Carey were the Court's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," 447 U.S. at 462-63, 100 S.Ct. at 2291 (citations and quotations omitted), and the Court's disapproval of favoritism for speech by labor unions to the exclusion of others' protests on other subjects of public interest and importance
 
 
 [10]
 Although Van Bergen also held that the "efficient conduct of business operations" is a significant governmental interest justifying limits on free speech, 59 F.3d at 1554, we view this rationale with caution and skepticism. See Waters v. Churchill, --- U.S. ----, ----, 114 S.Ct. 1878, 1888, 128 L.Ed.2d 686 (1994) ("The government cannot restrict the speech of the public at large just in the name of efficiency.")
 
 
 [11]
 In Babbitt, the Supreme Court further explained:
 When contesting the constitutionality of a criminal statute, "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." Steffel v. Thompson, 415 U.S. 452, 459 [94 S.Ct. 1209, 1215-16, 39 L.Ed.2d 505] (1974); see Epperson v. Arkansas, 393 U.S. 97 [89 S.Ct. 266, 21 L.Ed.2d 228] (1968); Evers v. Dwyer, [358 U.S. 202, 204, 79 S.Ct. 178, 179-80, 3 L.Ed.2d 222 (1958) ]. When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." Doe v. Bolton, 410 U.S. 179, 188 [93 S.Ct. 739, 745-46, 35 L.Ed.2d 201] (1973).
 442 U.S. at 298, 99 S.Ct. at 2308-09. Although Bland and other ADAD users in California do not face criminal penalties, they do face grave consequences for violations of the civil statute, including civil fines and private suits for damages.
 
 
 [12]
 It is true that Senior Assistant Attorney General Herschel T. Elkis declared that the Attorney General's office "has not brought or indicated that it would bring any action" under the civil statute. However, this is far short of a disavowal of enforcement. There is little comfort in these words for an ADAD user
 
 
 [13]
 The legislature found the use of ADADs without a "natural voice first informing the person answering" of identifying information concerning the caller and "obtaining the consent of that person to listen" to be an unfair method of competition and a deceptive practice. Cal. Civ.Code § 1770(v)(1)