**Dr. Marcus CONANT, et al., Plaintiffs,**

v.

**Barry R. McCAFFREY, as Director, United States Office of National Drug Control Policy, et al., Defendants.**

**No. C 97–0139 FMS.**

United States District Court,
N.D. California.

April 30, 1997.

Ann Brick, American Civil Liberties Union Foundation of Northern CA Inc., Lowell Finley, Graham A. Boyd, Jonathan Weissglass, Altshuler Berzon Nussbaum, Berzon & Rubin, San Francisco, CA, for plaintiffs.

Arthur R. Goldberg, Kathleen Moriarty Mueller, David J. Anderson, Department of Justice, Civil Division, Washington, DC, for defendants.

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, CLASS CERTIFICATION; DENYING DEFENDANTS' MOTION TO DISMISS; SCHEDULING ORDER

FERN M. SMITH, District Judge.

## INTRODUCTION

Pending are plaintiffs' motions for class certification and a preliminary injunction, and defendants' motion to dismiss. Plaintiffs' motion for a preliminary injunction requires a determination whether plaintiffs have raised serious questions about whether the government's response to California's Compassionate Use Act violates the First Amendment rights of physicians and patients who communicate with each other about the use of medical marijuana to treat disease. It must also be determined whether plaintiffs have demonstrated that the balance of hardship tips in their favor. Plaintiffs' motion for class certification requires a determination whether plaintiff physicians and patients have fulfilled the prerequisites for maintaining their case as a class action.[1]

Plaintiffs have raised serious questions as to whether the government's medical marijuana policy is impermissibly vague. Further, because the policy may infringe on plaintiffs' First Amendment rights and is affecting physicians' treatment of patients suffering from life-threatening diseases, the balance of hardships tips in plaintiffs' favor. For these reasons, the Court issues a preliminary injunction limiting the government's ability to prosecute physicians, revoke their prescription licenses, or bar their participation in Medicare and Medicaid because they recommend medical use of marijuana. The Court also grants plaintiffs' motion for class certification.

## BACKGROUND

In November 1996, the citizens of California passed an initiative known as Proposition

---

1. Because defendants attached to their motion to dismiss a document that was outside the scope of the pleadings, that motion is procedurally improper, and the Court is precluded from considering it under Federal Rule of Civil Procedure 12(b)(6). Because it is incorporated by reference into defendants' opposition to plaintiffs' motion for a preliminary injunction, however, all the arguments raised in defendants' motion to dismiss are analyzed as part of this order.

215 or the Compassionate Use Act. The initiative took legal effect at 12:01 a.m. on Wednesday, November 6, 1996. It provides, in pertinent part, that

> seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.

Cal. Health & Safety Code § 11362.5(a) (West 1997). Under the Act, neither patients nor physicians may be punished or denied any right or privilege for conduct relating to medical use of marijuana. *Id.* at § 11362.5(b)(1)(B) & 11362.5(d).

Before considering the issues raised by the parties, it is important to recognize what this case is about. It is not about doctors prescribing, growing, or distributing marijuana, nor is it about giving free rein to patients to make massive purchases of marijuana for distribution. Instead, this case is about the ability of doctors, on an individualized basis, to give advice and recommendations to bona fide patients suffering from serious, debilitating illnesses regarding the possible benefits of personal, medical use of small quantities of marijuana.

Although the Drug Enforcement Agency has determined that marijuana has "no currently accepted medical use in treatment in the United States," 57 Fed.Reg. 10,499 (1992), and the Court of Appeals for the District of Columbia Circuit affirmed that determination, see *Alliance for Cannabis Therapeutics v. Drug Enforcement Admin.*, 15 F.3d 1131, 1137 (D.C.Cir.1994),[2] a majority of Californians, and many physicians, apparently believe that medical marijuana may be a safe and effective treatment for certain diseases. Proposition 215 passed by a wide margin, and plaintiff physicians claim to have recommended medical marijuana to patients for many years.

According to the complaint, prior to passage of the Compassionate Use Act, the federal government had neither punished nor threatened physicians in any way for recommending the medical use of marijuana to seriously ill patients. As the election approached, however, and polls indicated that Proposition 215 would likely pass, defendant Barry McCaffrey, the director of the United States Office of Drug Control Policy, first suggested that the federal government would take action against physicians for conduct protected by the Act. Soon after Proposition 215's enactment, the government confirmed that it would prosecute physicians, revoke their prescription licenses, and deny them participation in Medicare and Medicaid for recommending medical marijuana. In the months since the election, federal officials have made at least fifteen separate statements verifying the government's intent.

On February 14, 1997, plaintiffs—ten physicians, five patients, and two nonprofit organizations—filed this case, contending that the government's medical marijuana policy infringes on the First Amendment rights of both physicians and patients. Plaintiffs proffered declarations indicating that some physicians are sufficiently worried by the government's threats that they are afraid to offer patients their best medical judgment regarding the use of marijuana to treat disease, and have begun to censor their communications with patients. Plaintiffs claim that physicians' self-censoring threatens the integrity of the physician-patient relationship and prevents proper patient care. Equally important, plaintiffs contend that the "chilling" of physician-patient communication violates the First Amendment rights of physicians and patients alike. Plaintiffs filed a motion for a preliminary injunction, asking the Court to declare that because physician-patient communication is protected speech under the First Amendment, the government may neither prosecute nor administratively sanction physicians for recommending medical use of marijuana. Seeking to protect the rights of

---

**2.** Since *Alliance* in 1994, the government apparently has conducted no scientific studies to determine the medical efficacy of marijuana, nor has it granted permission for anyone else to conduct such studies.

all California physicians and patients, plaintiffs also filed a motion for class certification.

On February 28, 1997, defendants filed their opposition to plaintiffs' motion for a preliminary injunction, and a motion to dismiss the complaint. Defendants' opposition and motion are based in large part on a February 27, 1997 letter from the Assistant Secretary for Health and the Acting Assistant Attorney General purporting to clarify the government's medical marijuana policy. The letter states that physicians may discuss medical marijuana with their patients but may not "intentionally provide their patients with oral or written statements in order to enable them to obtain controlled substances in violation of federal law." (Declaration of Kathleen Moriarty Mueller ("Mueller Decl.") Ex. 7.) Defendants argue that this clarification is consistent with First Amendment jurisprudence and eliminates any case or controversy because it delineates the limits of permissible behavior for physicians.

The motions were heard and fully argued on April 11, 1997. Although the parties differed to some degree about the parameters of constitutional government policy, the Court believed these differences might be resolved without further litigation and that such resolution would be in the public interest. It therefore ordered the parties to a settlement conference before the Honorable Eugene F. Lynch. In the interim, the Court issued a temporary restraining order preventing the government from taking action against physicians.

The parties met with Judge Lynch for the first time on April 17, 1997. On April 21, 1997, the temporary restraining order was extended so that the parties could meet again with Judge Lynch on April 29, 1997. Because the parties have been unable to resolve their differences, these rulings on the pending motions now issue.

## DISCUSSION

### I. Legal Standard for Preliminary Injunctions

■ In order for the Court to issue a preliminary injunction, plaintiffs must show "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor." *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987) (citing *Sardi's Restaurant Corp. v. Sardie,* 755 F.2d 719, 723 (9th Cir.1985)). These two standards do not represent separate tests for the grant of a preliminary injunction but are rather two ends of "a continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *San Diego Comm. Against Registration and The Draft (Card) v. Governing Bd. of the Grossmont Union High Sch. Dist.,* 790 F.2d 1471, 1473 n. 3 (9th Cir.1986).

■ In determining which test to apply, the Court first considers the parties' relative hardships. *See Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir.1991). "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Id.* (internal citation and quotation marks omitted). Deprivation of First Amendment freedoms "unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). Because plaintiffs allege unconstitutional chilling of free speech, the test to be applied in determining whether an injunction is warranted tends more toward the "serious questions" side of the continuum. *See Gilder,* 936 F.2d at 422. The "serious questions" approach requires the Court to determine only that the questions raised by plaintiffs are a " 'fair ground for litigation.' " *Id.* (citation omitted). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id.* (internal citation and quotation marks omitted).

### II. Analysis

Following the passage of Proposition 215 in California, the federal government made numerous declarations regarding its position on the limits that federal drug laws impose on physician-patient discussions about marijuana, notwithstanding the state voter initia-

tive. High ranking administration officials, including defendants, have given varied public interpretations of the limits of federal authority—in formal documents, during congressional committee hearings, and in interviews with the press.

On December 2, 1996, defendant Thomas A. Constantine, the administrator of the Drug Enforcement Administration ("DEA"), appeared before the Senate Judiciary Committee to discuss the DEA's response to the Compassionate Use Act. Constantine testified that the DEA will "[t]ake both administrative and criminal actions against physicians who violate the terms of their DEA drug registrations that authorize them to prescribe controlled substances." Constantine stated that physicians who prescribe or recommend Schedule I substances violate federal law. (Declaration of Jonathan Weissglass ("Weissglass Decl.") Ex. C at C28–C31.)

On December 30, 1996, numerous Clinton administration officials, including defendants McCaffrey, Janet Reno, and Donna Shalala, convened a news conference to delineate "officially" the administration's policy. (Declaration of Graham A. Boyd ("Boyd Decl.") Ex. B.) At the conference, defendants distributed a seven-page memorandum entitled "The Administration's Response to the Passage of California Proposition 215 and Arizona Proposition 200" ("Administration Response"). See 62 Fed.Reg. 6164 (1997); Boyd Decl. Ex. C. The Administration Response described specific sanctions that the federal government would impose on physicians "who recommend or prescribe Schedule I controlled substances," including: (1) revocation of medical licenses, (2) exclusion from Medicare and Medicaid programs, and (3) criminal prosecution. See id. at 6164.

Subsequent to the filing of plaintiffs' lawsuit, the Department of Health and Human Services ("DHHS") and the Department of Justice ("DOJ") issued a joint letter to "clarify" the scope of the Administration Response and eliminate misperceptions that had developed regarding the federal government's interpretation of federal drug laws ("Clarification to Administration Response" or "Clarification"). The Clarification states that federal law does not prohibit physicians from discussing the risks and benefits of marijuana, and that the federal government did not intend to establish a "gag rule" to prevent physicians from communicating their professional judgments regarding the risks and benefits of any course of treatment. See Mueller Decl. Ex. 7 at 1. The Clarification also states, however, that "[p]hysicians may not intentionally provide their patients with oral or written statements in order to enable them to obtain controlled substances in violation of federal law. Physicians who do so risk revocation of their DEA prescription authority, criminal prosecution, and exclusion from participation in the Medicare and Medicaid programs." Id.

Since issuance of the Clarification, federal officials have continued to promote the administration's position. For example, at the April 1997 American Methadone Treatment Association ("AMTA") conference in Chicago, defendant McCaffrey, a keynote speaker, and his staff distributed a folder entitled "Office of National Drug Control Policy, Executive Office of the President" to all conference participants. (Declaration of Daniel N. Abrahamson re: Defendants' Ex Parte Motion for Clarification of the 4/11/97 TRO ("Abrahamson Decl.") ¶ 4.) The folder included the December 30, 1996 Administration Response to Proposition 215 but made no mention of the Clarification to the Administration Response. Id. It unequivocally stated that the administration would seek to revoke practitioners' licenses, prevent practitioners from participating in Medicare and Medicaid programs, and impose criminal sanctions on practitioners for "recommending" marijuana to their patients.[3] Id.

## A. Ripeness

Despite the varying interpretations of the federal government's policy given by admin-

---

3. Plaintiffs have provided the Court with a chronology of press reports on the administration's position on medical marijuana. The articles present varying interpretations of the administration's policy. Many of the statements are imper-

missible hearsay; however, the chronology demonstrates the shifting sands of the government's policy. See Plaintiffs' Reply Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction ("Pls.' Reply") App. A.

istration officials, defendants insist that the Clarification has eliminated any confusion about the policy. Because the policy is clear, defendants argue, there can be no case or controversy over its interpretation.

### 1. Legal Standard

■ Article III of the Constitution prohibits courts from engaging in hypothetical or abstract legal disputes; courts may decide only cases that present real and substantial controversies between parties which can result in actual and adverse consequences. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297–98, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979); *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945). This "ripeness" inquiry focuses on two distinct elements, "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). If either element is not established, a dispute is not ripe for resolution. *See Socialist Labor Party v. Gilligan*, 406 U.S. 583, 589, 92 S.Ct. 1716, 1720, 32 L.Ed.2d 317 (1972) (holding that a dispute was not ripe because of the lack of an adequate record).

#### a. Fitness of the Issues

■ A claim attacking an administrative action is fit for decision if the parties present a sufficient factual record and establish that the challenged administrative action is final. *See Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1381 (9th Cir.1986) (citing *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. at 1515–16). Facial attacks on statutes, raising issues of law, do not require a significant development of the factual record prior to judicial determination. *See Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1434 (9th Cir.1996). "If it is inevitable that the challenged rule will operate to the plaintiff's disadvantage—if the court can make a firm prediction" that the harm will occur—there is a justiciable controversy. *See id.* at 1436 (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 69, 113 S.Ct. 2485, 2501, 125 L.Ed.2d 38 (1993)

(O'Connor, J., concurring)) (internal quotation marks omitted).

A controversy is ripe if the challenged administrative decision is final within the meaning of section 10 of the Administrative Procedure Act, 5 U.S.C. § 704 ("APA"). The APA defines final agency action as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. at 1516 (quoting 5 U.S.C. §§ 551(4), 551(13)) (internal quotation marks omitted). Courts employ a flexible and pragmatic test to ascertain the finality of an administrative action. *See Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Board of Oil & Gas Conservation of Mont.*, 792 F.2d 782, 789 (9th Cir.1986). They look to numerous factors, including: whether the action is a definitive statement of any agency's position; whether the action has an effect on the day-to-day business of the complaining parties; and whether the agency expects immediate compliance. *See Municipality of Anchorage v. United States*, 980 F.2d 1320, 1323 (9th Cir.1992) (citing *Mt. Adams Veneer Co. v. United States*, 896 F.2d 339, 343 (9th Cir.1989)). The agency action must represent "the final administrative word to insure that judicial review will not interfere with the agency's decision making process." *State of Cal., Dep't of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir.1987).

#### b. Hardship to Parties

■ Plaintiffs challenging a statute, regulation, or policy must demonstrate a realistic possibility of sustaining an injury as a result of the its enforcement, *see O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); however, they need not wait for "the consummation of threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923). "If injury is certainly impending, that is enough." *Id.; see Bland v. Fessler*, 88 F.3d 729, 736–37 (9th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 513, 136 L.Ed.2d 403 (1996).

■ Plaintiffs contesting criminal statutes do not have to expose themselves to "actual arrest or prosecution" prior to chal-

lenging the constitutionality of a statute. See *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974); *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) (holding that a plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief"). Additionally, challenges to statutes based on the First Amendment receive special consideration because "free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." *Bland*, 88 F.3d at 737 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965)). If the plaintiffs cannot establish that a prosecution is likely to occur, however, a constitutional challenge is not justiciable. *See Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 749–50, 27 L.Ed.2d 669 (1971).

### 2. Analysis of Plaintiffs, Claims

#### a. Fitness of the Issues Presented

 Defendants maintain that the Court cannot entertain plaintiffs' challenge because the complaint and surrounding factual circumstances do not create a sufficiently concrete record. Defendants contend that without an actual prosecution, the Court cannot properly determine whether the government interprets the term "recommendation" in a manner violative of physicians' free speech right. The Court finds to the contrary. Plaintiffs have shown that because the government continues to vacillate in its description of sanctionable conduct, its policy is subject to numerous interpretations. Plaintiffs have also demonstrated that the government policy "chills" speech. Because this is a facial challenge involving questions of First Amendment law, no further factual development is required. *See Newcomb*, 82 F.3d at 1434.

 Under the factors set forth by the Ninth Circuit in *Mt. Adams Veneer Co.*, the government's various statements represent a final administrative action with the meaning of the APA. *See* 896 F.2d at 343. First, defendants are the highest ranking officials in their respective agencies. Their statements equate to federal agency interpretations of federal drug law. Second, plaintiff physicians and patients are being affected adversely by the government's conflicting statements of law—they allege a chilling of free speech. Finally, the agencies expect immediate compliance with their policy pronouncements: at different times, each agency has declared that, notwithstanding Proposition 215, it would take immediate action against physicians and others who violate federal drug policies.[4]

#### b. Plaintiffs, Hardships

Because they fear prosecution or administrative sanction, plaintiff physicians contend they have censored their medical advice to patients, refusing to provide guidance regarding the risks and benefits of medical marijuana. *See, e.g.*, Declaration of Stephen O'Brien, M.D. ("O'Brien Decl.") ¶ 11. Despite defendants' alleged clarification of federal policy, the physicians remain unsure as to whether bona fide discussions regarding medical marijuana will result in federal punishment. *See, e.g.*, Complaint ¶¶ 7, 8, 9, 10; Declaration of Neil M. Flynn, M.D. ("Flynn Decl.") ¶ 5. Their fears are corroborated by the testimony of Robert Mastroianni, M.D. ("Dr.Mastroianni"). Dr. Mastroianni has been interrogated by DEA agents who questioned his medical education and training, confronted a pharmacist regarding prescriptions he has dispensed, and informed him that it was illegal to "recommend or prescribe" marijuana. (Declaration of Robert Mastroianni ("Mastroianni Decl.") ¶¶ 5, 7, 10.)

Plaintiff patients allege that as a result of the government's policy, they no longer trust in their physicians' advice, and can no longer comfortably communicate with their physicians about medical marijuana. *See, e.g.*, *Complaint* ¶¶ 16–20; Declaration of Daniel J. Kane ("Kane Decl.") ¶ 7–8; Decl. of Jo Daly ("Daly Decl.") ¶ 15. Both patients and physicians agree that patient care is threatened by this lack of confidence and communications.

4. The swiftness of the government's response to the proposition is evidenced by the January 27, 1997 threats to Dr. Mastroianni. See discussion *infra* part II.A.2.b.

(Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction ("Mot. for Prelim. Inj.") at 8–10.) Plaintiffs describe various results of the decrease in open communication: patients are less likely to tell their physicians about marijuana use; physicians, in turn, are unable to advise patients about safe use of marijuana or guide proper use of marijuana for treatment; and physicians are discouraged from recording their patients' full medical histories and progress on medical charts. *See id.* at 9–10.

Defendants contend that because the Administration Response and Clarification do not change the law, but only interpret it, no justiciable controversy exists. Defendants reiterate that the government's approach does not place physicians in any type of danger of criminal sanctions for merely discussing the potential risks or benefits of the medical use of marijuana; according to defendants, physicians must refrain only from giving recommendations intended to facilitate their patients' acquisition or possession of marijuana in violation of federal law. The Court finds these arguments unpersuasive.

■■■ The government persists in issuing ambiguous and conflicting interpretations of medical marijuana policy. Indeed, at the hearing on these motions, the government's attorneys were unable clearly to articulate the contours of federal policy on the subject. In light of this confusion, and the harms demonstrated by plaintiffs, the Court finds this case ripe for review. *See Bolton,* 410 U.S. at 188, 93 S.Ct. at 745–46.

### B. Class Certification

In conjunction with the motion for a preliminary injunction, plaintiffs have moved for class certification. Because Federal Rule of Civil Procedure 23(c)(1) requires that the Court make an initial determination regarding class certification "as soon as practicable," the Court considers plaintiffs' motion at this time.

### 1. Legal Standard

■■■ The burden of proving that a class action is appropriate rests with the propo-

nent of the class. *See In re Northern Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.,* 693 F.2d 847, 854 (9th Cir.1982); *Shields v. Smith,* [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,001, 94,376, 1992 WL 295179 (N.D.Cal.1992). The party seeking to maintain the action as a class suit must, therefore, establish a prima facie showing of each of the four certification prerequisites and demonstrate that appropriate grounds for a class action exist. *See Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975). The failure to carry this burden as to any one of the requirements precludes the maintenance of the lawsuit as a class action. *See Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668, 673 (9th Cir.1975).

Class certification is governed by Federal Rule of Civil Procedure 23, which provides for a two-step procedure. First, subsection (a) of Rule 23 sets out four conjunctive requirements that must be met in all class actions:

> (1) the class [must be] so numerous that joinder of all members is impracticable, (2) there (must be) questions of law or fact common to the class, (3) the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class, and (4) the representative parties [must] fairly and adequately protect the interests of the class.

If these requirements are met, the proponent must also show that it has met one of the four disjunctive prerequisites of subsection (b) of Rule 23. Under this subsection, the Court must find either: (1) that common questions of law or fact predominate and that a class action is superior to other available methods of adjudication; (2) that the defendant acted or refused to act on grounds generally applicable to the class, so that declaratory or injunctive relief is appropriate with respect to the entire class; (3) that the prosecution of individual actions would create a risk of inconsistent verdicts that would establish incompatible standards of conduct for defendants; or (4) that adjudication of individual claims would be dispositive of the claims of non-party class members, or substantially impede the ability of non-party

class members to pursue their own claims. Fed.R.Civ.P. 23(b)(1)-(3).

Before ordering that a lawsuit may proceed as a class action, the Court must rigorously analyze whether the class action allegations meet the requirements of Rule 23. *See General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir.1992). Because the early resolution of the class certification question requires some degree of speculation, however, the Court need only form a "reasonable judgment" on each certification requirement. In formulating this judgment, the Court may properly consider both the allegations of the class action complaint and the supplemental evidentiary submissions of the parties. *Blackie,* 524 F.2d at 900–01 & n. 17.

## 2. Analysis

Plaintiffs originally sought certification of a class of:

(a) All physicians present and future who are licensed by and practicing medicine in California and who, using their best medical judgment in the context of a bona fide physician-patient relationship, have discussed, recommended or approved the medical use of marijuana for their patients, or but for defendants' threats of punishment, would discuss, recommend or approve or consider discussing recommending or approving the medical use of marijuana for their patients; and

(b) All patients in California who seek to communicate with their physicians or receive the recommendation or approval of their physician, in the context of a bona fide physician-patient relationship, regarding the medical use of marijuana.

(Notice of Motion and Motion for Class Certification and Memorandum in Support at 1.) In response to defendants' contention that this definition was too broad, plaintiffs narrowed the scope of the proposed class, and now seek certification of the following class:

(a) All physicians licensed by and practicing in California who recommend or have recommended to a patient the medical use of marijuana or who discuss with or have

discussed with a patient the medical use of marijuana; and

(b) All patients to whom those recommendations are or were made or with whom those discussions are or were held.

(Reply Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Class Certification at 1.) This proposed class remains broader than the allegations in plaintiffs' complaint and the evidence submitted by plaintiffs in support of their motion for preliminary injunction.

The record is limited to the recommendation and/or use of medical marijuana in very specific circumstances. Plaintiffs allege that "[f]or at least two decades, hundreds of physicians in California have recommended use of marijuana, often as a medicine of last resort, to seriously ill patients suffering from debilitating conditions including cancer, AIDS and glaucoma." (Complaint ¶ 2.) Although not specifically alleged in the complaint, plaintiff Valerie Corral's experience suggests that physicians in California also recommend use of marijuana for patients suffering from seizures. *See* Complaint ¶ 19; Declaration of Valerie Corral ("Corral Decl.") ¶ 19. These allegations are buttressed by an article submitted by plaintiffs indicating that nearly half of oncologists randomly surveyed report recommending that their patients use marijuana. *See* Declaration of Kevin B. Zeese ("Zeese Decl.") Ex. 23 (Richard E. Doblin & Mark A.R. Kleiman, *Marijuana as Antiemetic Medicine: A Survey of Oncologists' Experiences and Attitudes,* 9 J. of Clinical Oncology 1314–1319 (1991)).

In his declaration, plaintiffs' witness Kevin B. Zeese, president of Common Sense for Drug Policy, describes the scientific literature supporting the use of marijuana for treatment of cancer, (Zeese Decl. ¶ 1 13); HIV and AIDS, (Zeese Decl. ¶ 14); glaucoma, (Zeese Decl. ¶ 15); and epilepsy (Zeese Decl. ¶ 16). Plaintiffs' complaint describes how marijuana is used to treat diseases other than epilepsy that involve seizures and muscle spasms. (Complaint ¶ 32(e) (multiple sclerosis), ¶ 32(f) (paraplegia and quadriplegia).) Although Mr. Zeese intimates that marijuana may be effective in treating a

number of other ailments—including hypertension, peptic ulcers, and asthma, (Zeese Decl. ¶ 8)—neither the record nor the evidence presently supports this suggestion.

Indeed, the proffered class representatives in this case recommend or use marijuana only for a narrow range of illnesses. The physician class representatives include eight clinicians specializing in the treatment of HIV and AIDS, and two oncologists. The patient class representatives include two people living with HIV or AIDS, two cancer patients, and one person suffering from seizures. In their declarations, all of the proffered class representatives limit their discussion of medical marijuana to its use in connection with these illnesses.

■■■ This record does not support certifying a class as broad as the one requested by plaintiffs. Instead, the Court exercises its discretion to limit the definition of the proposed class to provide more appropriate limits, see *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 64 (D.Nev.1985), and defines the class as follows:

(1) All licensed physicians practicing in the State of California who treat patients diagnosed with HIV/AIDS, cancer, glaucoma, and/or seizures or muscle spasms associated with a chronic, debilitating condition, and who, in the context of a bona fide physician-patient relationship, discuss, approve, or recommend the medical use of marijuana for these patients based on the physician's best medical judgment; and

(2) All patients in the State of California diagnosed with HIV/AIDS, cancer, glaucoma, and/or seizures or muscle spasms associated with a chronic, debilitating condition, who, in the context of a bona fide physician-patient relationship, communicate with their physicians about the medical use of marijuana.

This class meets the requirements imposed by Federal Rule of Civil Procedure 23. First, the large number of physicians and patients within the defined class, and their residences throughout California, make joinder of all class members impracticable. See *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184 (N.D.Ill.1992) (noting that numerosity may be supported by common-

sense assumptions). Second, plaintiffs' First Amendment challenge to the government's medical marijuana policy presents a common and dispositive issue of law. See *Jordan v. County of L.A.*, 669 F.2d 1311, 1321 (9th Cir.) (finding existence of discriminatory policy a common question sufficient to support a class action), *vacated on other grounds*, 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). Third, the named plaintiffs' claims are typical, stemming from the same course of conduct that forms the basis of the class action, and based on the same legal theory. See *id.* Fourth, the Court has no reason to question the named plaintiffs' adequacy as representatives, because it cannot identify any conflicts of interest among class members or reasons to questions class counsels' competence. See *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. at 2370 n. 13 (holding that parties are adequate representatives of absent class members if there are no conflicts of interest between representatives and class members, and counsel for the class will vigorously pursue the action). Finally, because defendants have acted on grounds generally applicable to the class in articulating their medical marijuana policy, injunctive relief is appropriate under Rule 23(b)(2). In fact, as the Advisory Committee's note to the provision states, Rule 23(b)(2) was intended to cover precisely this type of civil rights case. See Fed. R.Civ.P. 23(b)(2) advisory committee's note.

Defendants' objection to the breadth of plaintiffs' original proposed class definition was that the class members would not be readily ascertainable. Plaintiffs substantially alleviated this problem by revising the class definition in their reply brief. In further narrowing the definition, the Court has made the class sufficiently ascertainable for purposes of Federal Rule of Civil Procedure 23. Any remaining imprecision is immaterial. A precise class definition is less important in cases in which plaintiffs are attempting to certify a class for injunctive relief because the representative plaintiffs may move the Court to enforce compliance. See 5 *Moore's Federal Practice* 3d § 23.21[6], at 23–59 (Matthew Bender 3d ed.1997).

■ Although the Court grants plaintiffs' motion for class certification, "[a] decision as to class certification is not immutable." *Social Servs. Union, Local 535 v. County of Santa Clara,* 609 F.2d 944, 948–49 (9th Cir. 1979). If at any time before, during, or after trial it appears that the class definition is inappropriate, the Court may modify it, expand it, further narrow it, or withdraw certification altogether. *See id.* This authority to shape the litigation will be exercised whenever the circumstances so warrant.

## C. First Amendment

Plaintiffs assert, and defendants appear to concede, that the government's policy implicates First Amendment rights. In seeking to restrict what doctors may legally say to their patients concerning the use of medical marijuana, the government seeks to regulate physician-patient dialogue based on the content of that dialogue. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, ——, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995) (citing *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972)). This proposition is even stronger in situations in which the government targets particular views of the speaker on a given subject. *See Rosenberger,* 515 U.S. at ——, 115 S.Ct. at 2516; *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 2545, 105 L.Ed.2d 342 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). This case presents just that situation. Finding itself in disagreement with plaintiff physicians' views about the efficacy of medical marijuana, the government has announced a policy which significantly inhibits communication of those views.

■ The government concedes that it may not prohibit "discussion" of marijuana, *see, e.g.,* Boyd Decl. Ex. D (Letter from Kathleen Moriarty Mueller, Trial Attorney, Federal Programs Branch, United States Department of Justice, to Graham Boyd, Attorney, Altshuler, Berzon, Nussbaum, Berzon & Rubin 1–2 (Feb. 7, 1997)); but the government attempts to justify its policy of sanctioning physicians on the unremarkable and undisputed proposition that the government can regulate distribution and possession of drugs. The government's statutory authority to regulate that conduct, however, does not allow the government to quash protected speech about it. *See NAACP v. Alabama,* 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964) ("[A] governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms."). The government's fear that frank dialogue between physicians and patients about medical marijuana might foster drug use, see Defendants' Opposition to Motion for Preliminary Injunction ("Defs.' Opp'n") at 19–20, does not justify infringing First Amendment freedoms. *See 44 Liquormart, Inc. v. Rhode Island,* —— U.S. ——, ——, 116 S.Ct. 1495, 1508, 134 L.Ed.2d 711 (1996) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").[5]

Plaintiffs argue that the First Amendment protects the sanctity of physician-patient dialogue, and, in fact, that physician-patient communications receive heightened First Amendment protection. *See* Mot. for Prelim. Inj. at 15–16. Although the Supreme Court has never held that the physician-patient relationship, as such, receives special First Amendment protection, its case law assumes, without so deciding, that the relationship is a protected one. *See. e.g., Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 884, 112 S.Ct. 2791, 2824, 120 L.Ed.2d 674 (1992); *City of Akron v. Akron Ctr. for Reprod. Health, Inc.,* 462 U.S. 416, 445, 103 S.Ct. 2481, 2500–01, 76 L.Ed.2d 687 (1983)

---

5. Moreover, the government's fears in this case are exaggerated and without evidentiary support. It is unreasonable to believe that use of medical marijuana by this discrete population for this limited purpose will create a significant drug problem.

(discussing relationship of trust between patient and doctor). Thus, the Court has discussed the physician's right to exercise her best medical judgment, *see Casey,* 505 U.S. at 883–84, 112 S.Ct. at 2823–24, and the patient's right to rely on the medical advice of her physician. *See City of Akron,* 462 U.S. at 445, 103 S.Ct. at 2500–01; *see also Whalen v. Roe,* 429 U.S. 589, 604 n. 33, 97 S.Ct. 869, 879 n. 33, 51 L.Ed.2d 64 (1977) (commenting on doctor's right to administer medical care and patient's right to receive such care).

The Supreme Court has also indicated that physicians have a First Amendment right not to speak, *see Casey,* 505 U.S. at 884, 112 S.Ct. at 2824, implying that physicians must have the corollary right to speak. *Cf. City of Akron,* 462 U.S. at 445, 103 S.Ct. at 2500–01 (invalidating regulation that placed physicians in " 'undesired and uncomfortable straitjacket[s]' " in communicating with their patients) (citation omitted). Although the practice of medicine is subject to state regulation, it does not automatically follow that speech that would otherwise be protected if between two ordinary citizens somehow loses that protection when it occurs in the context of the physician-patient relationship. At the very least, courts confronted with the issue of regulation of physician speech have presupposed that speech between physicians and their patients is protected by the First Amendment. Moreover, sound policy reasons justify special protection of open and honest communication between those groups.

 Plaintiffs also argue that defendants may not justify censoring physician speech about medical marijuana on the ground that such speech constitutes incitement to unlawful conduct. Defendants do not contest this proposition. The First Amendment allows physicians to discuss and advocate medical marijuana, even though use of marijuana itself is illegal. What physicians may not do is advocate use of medical marijuana "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Branden-burg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (footnote omitted). Defendants make no argument that

physicians who discuss or recommend the use of medical marijuana are inciting imminent lawless action, and the record does not demonstrate that physician speech about medical marijuana could be characterized as incitement and thereby stripped of its First Amendment protection.

For the foregoing reasons, the broad reaches of the government's policy implicate speech that is protected by the First Amendment. Having so found, the Court must now determine whether plaintiffs have raised serious questions as to whether the government's policy violates the First Amendment and whether the balance of hardships tips in favor of plaintiffs.

Plaintiffs argue that the ambiguities in the government's policy render that policy facially invalid and therefore justify entry of a preliminary injunction. (Pls.' Reply at 2 & n. 6.) Vague or overbroad laws may be challenged facially. *See Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). Plaintiffs seem to argue both that the government's policy is void for vagueness and that it is overbroad. The Supreme Court views the doctrines of vagueness and overbreadth as related and similar doctrines, *see Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1858–59, 75 L.Ed.2d 903 (1983) (citations omitted), and cases involving facial challenges more often than not involve analysis of both doctrines. *See, e.g., Grayned,* 408 U.S. 104, 92 S.Ct. 2294. Because plaintiffs have met their burden of showing that there are serious questions as to whether the government's policy is unconstitutionally vague, no analysis of the the the overbreadth doctrine need be done at this time.

Due process requires that the prohibitions contained in a government policy, regulation, law, or other enactment be clearly defined. *See Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298–99. In the First Amendment context, the government may only regulate with "narrow specificity." *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963); *see Buckley v. Valeo,* 424 U.S. 1, 40–41, 96 S.Ct. 612, 645, 46 L.Ed.2d 659 (1976) ("Close examination of the specificity of the statutory limitation is required where,

as here, the legislation imposes criminal penalties in an area permeated by First Amendment interests."). A statute is void for vagueness if it fails to give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298–99. The First Amendment requires that citizens not be forced to " 'steer far wider of the unlawful zone,' than if the boundaries of the forbidden area were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964) (citation omitted).

Plaintiffs argue that the government's policy sweeps too broadly, leaving physicians confused as to the boundaries of the conduct it prohibits. This vagueness allegedly has led physicians to censor otherwise protected speech in order to ensure that they do not run afoul of conduct for which the government has threatened criminal prosecution and/or administrative sanctions. As discussed above, the government has issued numerous statements regarding its position on medical marijuana since Proposition 215 was passed. Several of those statements indicate that the government means to take action against physicians who simply recommend marijuana to treat disease. *See, e.g.*, Administration Response. In other statements, the government has conceded that physicians may discuss the risks and alleged benefits of medical marijuana, in the context of a bona fide physician-patient relationship, but has stated that they may not recommend marijuana "in order to enable [patients] to obtain controlled substances in violation of federal law." *See, e.g.*, Mueller Decl. Ex. 7 (Clarification). The government's statements range from suggesting that the government will use informers and surveillance to detect physicians who recommend medical marijuana to assuring that simple advice about the risks and benefits of marijuana for a specific patient will not subject physicians to government sanctions. *See* Weissglass Decl. Ex. C at C66, C98; Declaration of Steve Heilig ("Heilig Decl.") ¶ 9.

Plaintiff physicians' confusion as to how broadly the government's policy sweeps is understandable. Although the government

purported to "clarify" the reach of its policy in the February 27, 1997 letter to the California Medical Association and in the various papers it has filed regarding the pending motions, the government continues to waver on the scope of its policy. *See* discussion *supra* Part II. In oral argument before the Court, when asked where discussion ends and recommendation begins, counsel for defendants answered, "when [physicians] use the word 'recommend.' " Such semantic distinctions are insufficient to render the government's policy constitutionally valid.

■ The distinction the government attempts to draw between a permissible discussion and an impermissible recommendation may well break down in practical application. *See Buckley v. Valeo*, 424 U.S. at 42, 96 S.Ct. at 646 ("For the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application."). As in *Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945), the government seems to be seeking to confine physicians to "innocuous and abstract discussion" about medical marijuana and then to "becloud even this [discussion] with doubt, uncertainty and the risk of penalty." 323 U.S. at 536–37, 65 S.Ct. at 325. In *Thomas*, the Supreme Court invalidated a law on the ground that it was impossible for union members to draw the line between speech that could be found to convey the idea of solicitation and speech that would be classified as mere discussion or general advocacy: "[T]he supposedly clear-cut distinction between discussion, laudation, general advocacy, and solicitation puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers.... Such a distinction offers no security for free discussion." *Id.* at 535, 65 S.Ct. at 325. Similarly, in this case, when faced with the fickle iterations of the government's policy, physicians have been forced to suppress speech that would not rise to the level of that which the government constitutionally may prohibit. Plaintiffs therefore have raised at least serious questions as to whether the government's policy is unconstitutionally vague.

■ Having identified serious questions about the constitutionality of the government's policy, the balance of hardships between the parties must now be addressed. Plaintiffs allege that the government's threats of prosecution and administrative sanctions have severely intimidated physicians, leading many physicians to censor any discussion of marijuana with their patients. Some physicians have stopped discussing marijuana altogether. *See, e.g.*, Declaration of Milton N. Estes, M.D. ("Estes Decl.") ¶ 8; Declaration of Stephen Eliot Follansbee, M.D. ("Follansbee Decl.") ¶ 15. Plaintiffs also allege that physicians' self-censorship jeopardizes patient care, diminishing the trust between doctor and patient. Patients suffer because they are unable to get appropriate information about all potential treatment options. Plaintiffs allege this sometimes may mean the difference between life and death. (O'Brien Decl. ¶ 9.) Moreover, plaintiffs contend that physicians' self-censorship inhibits patients' honesty about marijuana use, which in turn limits physicians' ability to diagnose accurately and to treat effectively patients' illnesses or guide proper use of medical marijuana.

Defendants claim that plaintiffs' fears are speculative and that any chilling is subjective. The Supreme Court faced a similar argument in *Baggett v. Bullitt*, a case in which the State of Washington labeled the plaintiffs' concerns about the possible coverage of challenged loyalty oaths "wholly fanciful." 377 U.S. at 373, 84 S.Ct. at 1323. The Court noted that although the State may have been correct, "the [State's] contention only emphasize[d] the difficulties with the two statutes; for if the oaths do not reach some or any of the behavior suggested, what specific conduct do the oaths cover? Where does fanciful possibility end and intended coverage begin?" *Id.* at 373, 84 S.Ct. at 1323. In this case, it is hard to imagine that in every situation, a physician could easily determine whether a communication with a patient had crossed the line from protected speech to conduct the government has threatened to prosecute. The government cannot force physicians to choose between attempting to comply with a vague and broad policy, thereby limiting protected speech, or

discussing medical marijuana with their patients in the exercise of their best medical judgment, thereby incurring the risk of criminal prosecution or other sanctions. *See id.* at 374, 84 S.Ct. at 1323–24.

Defendants otherwise counter plaintiffs' claims of injury only by speculating that "between the lines of their papers," plaintiffs may really be claiming that they should be protected from the injury that allegedly occurs when doctors are unable to provide, and patients unable to obtain, marijuana for "treatment." The Court takes plaintiffs' claims at face value rather than reading between the lines.

■ Because plaintiffs have alleged deprivation of a First Amendment right, irreparable injury is presumed: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. at 373, 96 S.Ct. at 2690; *American–Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045, 1058 (9th Cir.1995). Plaintiffs also assert injury to the protected relationship between physicians and patients and potentially to patients' health. *See City of Akron*, 462 U.S. at 445, 103 S.Ct. at 2500 (striking down state regulation that placed " 'obstacles' in the path of the doctor upon whom [the patient] is entitled to rely for advice in connection with her decision") (citation omitted).

Defendants claim that a preliminary injunction would be contrary to the public interest because it would interfere with the government's ability to enforce federal drug laws. Defendants worry that the injunction "would authorize physicians to facilitate the cultivation, distribution, dispensing, and possession of marijuana through oral or written 'recommendations' without the corresponding registration, recordkeeping, or reporting requirements that Congress inserted in the Controlled Substances Act to permit the government to monitor the distribution of controlled substances." (Defs.' Op'n at 19–20.) Although neither the Court nor plaintiffs dispute the government's authority to enforce federal drug laws, defendants have done nothing to demonstrate that there is any-

thing more than the weakest link between non-criminal physician-patient dialogue about medical marijuana and the government's ability to enforce federal laws. This case involves no more than the ability of physicians to recommend personal use of marijuana to bona fide patients suffering from a narrow range of serious, debilitating diseases.

Because plaintiffs have shown both that there are serious questions as to the constitutionality of the government's policy and that the balance of hardships tips sharply in their favor, the Court may properly enter a preliminary injunction enjoining the government's policy, but only to the extent that such policy is likely unconstitutional. In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659, the Supreme Court established a bright line test in order to save a statutory provision from being unconstitutionally vague. *See id.* at 44, 96 S.Ct. at 646–47; *see also Thomas*, 323 U.S. at 535, 65 S.Ct. at 325 (discussing need to draw a "sharp line"). Plaintiffs request that the Court establish a bright line that shifts the focus away from physicians' state of mind and toward a discernible standard defining what physicians can and cannot write and say, and to whom. (Pls.' Reply at 13.) Although it is necessary in this case to establish a bright line test to address the serious questions as to the constitutionality of the government's policy, plaintiffs' theory about where the line should be drawn is problematic.

 The First Amendment does not protect speech that is itself criminal because too intertwined with illegal activity. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498, 69 S.Ct. 684, 688–89, 93 L.Ed. 834 (1949); *United States v. Mendelsohn*, 896 F.2d 1183, 1185 (9th Cir.1990). If physicians' conduct, which could include speech, rises to the level of aiding and abetting or conspiracy, in violation of valid federal statutes, such conduct is punishable under federal law. *See United States v. Freeman*, 761 F.2d 549, 552 (9th Cir.1985) ("[W]here speech becomes an integral part of the crime, a First Amendment defense is foreclosed even if the prose-

cution rests on words alone."). The Court cannot immunize such conduct by eliminating the ability of the government to prosecute physicians if the government can prove in individual situations that a physician had the requisite specific intent to commit the crime of aiding and abetting or conspiracy.[6]

What the Court may and will do, however, is to draw the line at criminal conduct, which plaintiffs concede the government may prosecute. To the extent that the government's definition of "recommend with the intent to facilitate" encompasses only that conduct which would rise to the level of aiding and abetting or conspiracy, such conduct, even if it includes pure speech, is punishable under criminal law. *See United States v. Barnett*, 667 F.2d 835, 841–43 (9th Cir.1982). The discussion of the Controlled Substances Act and the Medicare statute that follows illustrates how this line also protects the government's administrative power.

### D. Government Authority to Impose Administrative Sanctions

In addition to threatening criminal prosecution, defendants have threatened to take administrative action under the Controlled Substances Act and the Medicare statute against physicians for recommending medical marijuana. The Controlled Substances Act, 21 U.S.C. §§ 801–904, authorizes the government to register physicians and other manufacturers, distributors, and dispensers of controlled substances, 21 U.S.C. §§ 821–828, and to revoke those registrations under certain conditions. 21 U.S.C. § 824. The Medicare Statute, 42 U.S.C. §§ 1301–1324, contains the general provisions for publicly-assisted medical care. Section 1320 guides federal approval of Medicare projects, and includes provisions for excluding physicians from participation in Medicare programs under certain conditions. 42 U.S.C. § 1320a–7. Plaintiffs challenge the government's authority to sanction physicians under either statute for recommending medical marijuana to patients.

---

6. Similarly, the Court cannot restrict the DEA's administrative authority to sanction conduct that violates the Controlled Substances Act or the Medicare statute. *See* discussion *infra* part II.D.

## 1. Controlled Substances Act

Plaintiffs contend that the Controlled Substances Act ("CSA") gives the DEA authority to revoke a physician's license only if that physician commits an illegal act related to the distribution, dispensing, or manufacture of controlled substances. Defendants counter that the CSA provides broad authority to the DEA to revoke a physician's license for any act that violates the public interest. Defendants argue that a physician who recommends marijuana violates the public interest, making such a recommendation grounds for revocation of that physician's license.

In interpreting the CSA, traditional canons of statutory construction first require a consideration of the plain meaning of the terms of the statute. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987). The meaning of a term, however, "cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132, 113 S.Ct. 1993, 1996, 124 L.Ed.2d 44 (1993). If, after considering the language of the statute, a term remains ambiguous, the legislative history of the statute must be examined to ascertain the statute's scope and meaning. *See United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 516, 112 S.Ct. 2102, 2109, 119 L.Ed.2d 308 (1992).

Prior to 1984, the DEA could revoke, deny, or suspend a physician's prescription registration for three reasons: (1) falsification of an application to distribute, dispense, or manufacture controlled substances; (2) a felony conviction related to controlled substances; and (3) the suspension, revocation or denial of a state license or registration by an authorized state authority. *See* 21 U.S.C. § 824(a)(1)-(3). In 1983, as a provision of the Dangerous Drug Diversion Control Act, Congress added a fourth reason for revoking a physician's prescription license—violation of the public interest. *See* 21 U.S.C. § 824(a)(4); *Trawick v. Drug Enforcement Admin.*, 861 F.2d 72, 75 (4th Cir.1988). Section 823(f) of the CSA provides that the enforcing official should consider the following factors in determining what the public interest includes:

(1) The recommendation of the appropriate State licensing board or professional disciplinary authority.

(2) The applicant's experience in dispensing, or conducting research with respect to controlled substances.

(3) The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing or controlled substances.

(4) Compliance with applicable State, Federal, or local laws relating to controlled substances.

(5) Such other conduct which may threaten the public health and safety.

21 U.S.C. § 823(f).

In the abstract, the term "public interest" is broad and may allow the DEA wide latitude to revoke licenses for "recommending" marijuana; however, in the context of sections 823 and 824, the term public interest may be reasonably interpreted to encompass only actual violations of state and federal drug law.[7] *See, e.g., Trawick*, 861 F.2d at 76 ("It is clearly reasonable to interpret this unambiguous language as allowing negative action on a DEA registration based on a misdemeanor possession conviction that is *unrelated to the registrant's practice or the* diversion concerns of the amendment itself."). The Court has found no case, and defendants submit none, in which a court has concluded that sections 823 and 824 empower the DEA to revoke a physician's license for underlying conduct that did not violate federal, state, or local law, or state licensing guidelines. *See Humphreys v. DEA*, 96 F.3d 658, 661–62 (3d Cir.1996) (examining the public interest factors under section 823).

 To confirm this interpretation, the legislative history of the statute is instructive. *See Thompson/Center Arms Co.*, 504 U.S. at 516, 112 S.Ct. at 2109. During the

7. The Court does not accept as reasonable plaintiffs' extremely narrow interpretation that the DEA has the power to revoke licenses under section 824 only if a physician breaks the law regarding the distribution, dispersement, or manufacture of controlled substances. That interpretation is not consistent with the purpose or plain language of the CSA.

debate preceding enactment, Representative Rangel stated that the public interest amendment to the CSA would enable the DEA to revoke registrations of physicians who unscrupulously prescribe potent narcotics for addicts. *See* 130 Cong. Rec. H9682 (daily ed. Sept. 18, 1984) (remarks of Rep. Rangel) (quoted in *Trawick*, 861 F.2d at 75). The Senate Report on the bill explains that the public interest provision would enable the DEA to revoke licenses in instances that involve "violations involving controlled substances but are not punishable as felonies under State law." S.Rep. No. 225, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 3182, 3448–49 (quoted in *Trawick*, 861 F.2d at 75). This legislative history suggests that only convictions or uncharged criminal activity in violation of federal, state, or local law would suffice to establish a violation of the public interest as defined under sections 823 and 824. For these reasons, plaintiffs have raised serious questions as to whether the CSA can be interpreted in a manner that would allow the DEA to revoke a physician's license for merely recommending marijuana. As discussed above, *see supra* part II.C, the balance of harms weighs in favor of plaintiffs, making entry of a preliminary injunction appropriate.

### 2. Medicare Statute

Section 1320(a)–7 of Title 42 provides that individuals can be excluded from participation in Medicare and state health care programs under certain circumstances. The circumstances pertinent to this analysis include: (1) conviction for Medicare-related crimes, (2) conviction of a criminal offense relating to neglect or abuse of patients, (3) conviction relating to fraud, (4) conviction relating to obstruction of an investigation of Medicare fraud, (5) conviction relating to the manufacture, distribution, prescription, or dispensing of a controlled substance, and (6) claims for fraud or excess charges. *See* 42 U.S.C. § 1320(a)–7. Nothing in the text of this section supports defendants' argument that the DEA has the authority to exclude physicians from participation in Medicare or Medicaid programs for merely recommending marijuana to their patients without criminal intent.

■ Plaintiffs also have raised serious questions as to whether the Medicare statute can be interpreted in a manner that would allow the DEA to revoke a physician's Medicare participation solely for recommending medical use of marijuana. As discussed above, *see supra* part II.C, the balance of harms weighs in favor of plaintiffs, making entry of a preliminary injunction appropriate.

### CONCLUSION

Defendants argue that if a physician intentionally provides her patients with oral or written statements in order to enable them to obtain controlled substances, that physician may be liable for aiding and abetting a patient's unlawful purchase, cultivation, or possession of marijuana, 18 U.S.C. § 2, or for engaging in a conspiracy to cultivate, distribute, or possess marijuana, 21 U.S.C. § 846. (Defendants' Notice of Motion, Motion to Dismiss, and Memorandum of Points and Authorities ("Defs.' MTD") at 17–18.) Because defendants posit no other grounds for criminal liability, defendants may only prosecute physicians who recommend medical marijuana to their patients if the physicians are liable for aiding and abetting or conspiracy under these statutes.

■ Under federal law, one who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense "is punishable as a principal." 18 U.S.C. § 2. Criminal aiding and abetting liability under § 2 requires proof that the defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 190, 114 S.Ct. 1439, 1455, 128 L.Ed.2d 119 (1994) (internal quotation marks and citation omitted).

■ Under federal law, a person may be guilty of conspiracy if he makes an agreement to accomplish an illegal objective and knows of the illegal objective and intends to help accomplish it. *See* 21 U.S.C. § 846; *United States v. Gil*, 58 F.3d 1414, 1423 & n.

5 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 430, 133 L.Ed.2d 345 (1995); *Ninth Circuit Manual of Model Jury Instructions* 8.05A (West 1995). A defendant may be found guilty of conspiracy even if he does not realize direct benefits from the agreement, but instead conspires to benefit others. *See United States v. Carruth,* 699 F.2d 1017, 1021 (9th Cir.1983).

Because the First Amendment protects physician-patient communication up until the point that it becomes criminal, defendants may not prosecute California physicians unless the government in good faith believes that it has probable cause to charge under the federal aiding and abetting and/or conspiracy statutes. This requires that the government believe that it can prove that a physician had the specific intent to aid and abet or conspire. Moreover, because the Court has found serious questions as to whether the Controlled Substances Act and the Medicare statute permit sanctions for conduct relating to medical marijuana which falls short of criminal activity, defendants may not take administrative action against physicians for recommending marijuana unless the government in good faith believes that it has substantial evidence of the above-described criminal activity to support such action.

For the foregoing reasons, the Court PRELIMINARILY ENJOINS defendants, their agents, employees, assigns, and all persons acting in concert or participating with them, from threatening or prosecuting physicians, revoking their licenses, or excluding them from Medicare/Medicaid participation based upon conduct relating to medical marijuana that does not rise to the level of a criminal offense.[8] For the foregoing reasons, the Court also GRANTS plaintiffs' motion for class certification and DENIES defendants' motion to dismiss as moot.

The Court acknowledges that this injunction does not provide physicians with the level of certainty for which they had hoped; however, it would violate the constitutional separation of powers to limit prosecutorial discretion in the way plaintiffs request. As defendants have argued, the statutes on which the criminal and administrative sanctions proposed by defendants are based have not been challenged in this case as unconstitutionally vague.[9] Plaintiffs must therefore rely on existing case law interpreting these measures in circumscribing their conduct.

The case management conference scheduled for May 23, 1997 is CONTINUED until *June 13, 1997, at 8:30 a.m.,* in Courtroom 9. A joint case management statement shall be filed in advance in accordance with the local rule.

SO ORDERED.

---

8. Although the analysis in this order has focused on physician recommendation of medical marijuana, this preliminary injunction is also intended to cover non-criminal activity related to those recommendations, such as providing a copy of a patient's medical chart to that patient or testifying in court regarding a recommendation that a patient use marijuana to treat an illness. These activities implicate the same legal issues and harms as physician recommendations.

9. At least one court has already concluded that the drug conspiracy statute, 21 U.S.C. § 846, is neither vague nor violates the First Amendment. *See United States v. Cooper,* 606 F.2d 96, 98 (5th Cir.1979).