**LSO, LTD., a California corporation, Plaintiff–Appellant–Cross–Appellee,**

v.

**Jay STROH, Director of the California Department of Alcoholic Beverage Control, in his official and individual capacities; Manuel R. Espinoza, Chief Deputy Director of the California Department of Alcoholic Beverage Control, in his official and individual capacities; David E. Gill, District Supervisor, Rancho Mirage District Office Department of Alco-**

**holic Beverage Control, in his official and individual capacities, Defendants–Appellees–Cross–Appellants.**

**Nos. 98–56093, 98–56349 and 98–56465.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1999.

Filed March 6, 2000.

Peter J. Eliasberg, ACLU Foundation of Southern California, Los Angeles, California, for the plaintiff-appellant-cross-appellee.

Dana Thaddeus Cartozian, Deputy Attorney General, Los Angeles, California, for the defendants-appellees-cross-appellants.

Before: D.W. NELSON, BOOCHEVER, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

## OVERVIEW

This litigation arises from the efforts of Appellant Lifestyles Organization, Limited ("LSO") to hold its annual Erotic Art Exhibition and Trade Show in Palm Springs, California, in 1997. According to LSO's complaint, defendants Jay Stroh, Manuel R. Espinoza and David E. Gill, all officials of the California Department of Alcoholic Beverage Control ("ABC"), (collectively the "Officials") attempted to prevent LSO from holding the exhibition. They allegedly did this by threatening the Palm Springs Convention Center (the "Center") and other businesses with sanctions—up to and including loss of their liquor licenses—if they allowed LSO to display its art on their premises. The Officials based these threats on a California law prohibiting the display of certain sexual images, whether or not legally obscene, on the premises of establishments with liquor licenses. After the federal district court issued a temporary restraining order ("TRO") against the Officials, LSO held its event. On appeal, we must decide if LSO has standing to seek prospective and declaratory injunctive relief preventing the Officials from interfering with future LSO art exhibitions. We must also decide if the Officials are entitled to qualified immunity in a suit seeking damages for their actions against the 1997 exhibition. We have jurisdiction under 28 U.S.C. § 1291. We hold that

LSO has standing and that the Officials were not entitled to qualified immunity.[1]

## FACTS AND PROCEDURAL HISTORY [2]

LSO is a California corporation that operates a membership organization consisting of approximately 30,000 members. It has held a convention every year since 1973, and at least seventeen of these have been in California. Since 1991, LSO's annual convention has included a Sensual and Erotic Art Exhibition. This event, according to LSO, is "the premiere exhibition devoted to erotic art in the United States." In addition to the art exhibition, the conventions include a trade show typically featuring a wide variety of exhibitors, including artists and art galleries, members of the travel industry, and publishers. In recent years, several thousand people have attended each convention.

LSO planned to hold its 1997 convention in Palm Springs. It chose the Center, a facility owned and operated by the City of Palm Springs, to host most of the events related to the convention. It contracted with the Center for exclusive use of the Convention Center, including all corridors and public areas, for July 30 through August 2, 1997.[3] According to LSO, its employees and agents invested considerable time and effort to prepare for the organization's convention, especially the art exhibition. LSO planned to follow its long-standing practice of prohibiting alcohol in the area where the art exhibition and trade show were taking place.

1. We also affirm the district court's award of attorneys' fees to LSO with respect to the TRO. We do not consider LSO's appeal of the district court's award of costs to the Officials because a new determination of which party "prevailed" will have to be made at the conclusion of proceedings on remand.

2. In reviewing the district court's decision dismissing claims pursuant to Fed.R.Civ.P. 12(b)(6), we must accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party. See Tworivers v. Lewis, 174 F.3d

987, 991 (9th Cir.1999). In reviewing the district court's order granting summary judgment, we view the evidence in the light most favorable to the nonmoving party. See Berry v. Valence Tech., Inc., 175 F.3d 699, 703 (9th Cir.1999). LSO was the nonmoving party on the issues of standing and qualified immunity.

3. LSO says it also had planned to display the art exhibition at other venues in California, as it had done after its 1995 convention, but decided against doing so because of the Officials' actions.

It is undisputed that LSO's exhibitions do not include art that is legally obscene. Nonetheless, much of the art LSO intended to display in 1997 plainly fell within the proscriptions of California Administrative Code, Title 4, Section 143.4, which prohibits, on any premises holding a liquor license,

[t]he showing of film, still pictures, electronic reproduction or other visual reproductions depicting:

(1) Acts or simulated acts of sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law.

(2) Any person being touched, caressed or fondled on the breast, buttocks, anus or genitals.

(3) Scenes wherein a person displays the vulva or the anus or the genitals.

(4) Scenes wherein artificial devices or inanimate objects are employed to depict, or drawings are employed to portray, any of the prohibited activities described above.

In May 1997, appellee Gill, the District Supervisor at the ABC's Rancho Mirage District Office, convened a meeting of representatives of several ABC licensees, including the Center and several of the hotels which were to host events of the convention.[4] LSO's president, Robert L. McGinley, and an attorney for LSO, Paul Murray, also attended.

Although the parties' versions of what happened at the meeting differ in some respects, they agree that, at a minimum, Gill read aloud from Section 143.4 and told the assembled representatives that ABC regulations applied to all parts of licensed facilities, even if no alcohol was being served in the precise area within the premises; that the ABC licensees were responsible for any violations of ABC regulations occurring on licensed premises; and that the ABC licensees were subject to sanc-

tions ranging from a warning to revocation of its license.

Because the Center had a liquor license, LSO's representatives became concerned that Section 143.4 might prevent LSO from holding the exhibition there in the event a violation occurred. Attorney Murray offered to designate the parts of the Center where the trade show and art exhibition were to take place as alcohol-free zones during those events, on the theory that, in such a case, the ABC regulations would not apply there. The Officials ultimately rejected this proposal, maintaining it was not possible to "de-license" an area within the physical limits of a larger licensed area for the purposes of engaging in conduct otherwise prohibited by the liquor laws. Gill later mailed the text of Section 143.4 to the licensees. A letter accompanying the statute said: "Please be advised that the activity listed in these statutes cannot occur at any time on any portion of your licensed premises."

On June 24, 1997, McGinley and Murray met with Espinoza, who was ABC's Chief Deputy Director; Stroh, ABC's Director; and Kenton Byers, ABC's chief counsel. At this meeting appellee Espinoza allegedly expressed the view that the art exhibition would violate ABC regulations. LSO attempted to negotiate with the Officials, but the parties were unable to reach an agreement that would allow the exhibition to go forward at the Center without risk of ABC-imposed sanctions.

During the same time period, Gill had numerous conversations with Jim Dunn, general manager of the Center, which included discussion of LSO's planned art exhibition and ABC regulations. Gill told Dunn that the Center faced a threat of disciplinary action if displays in violation of the regulations were permitted. Dunn sent numerous letters to LSO discussing his concerns over the exhibition and the possibility of sanctions from ABC. He sug-

---

4. According to the Officials' brief, Gill decided to call the meeting in part because of an ABC report describing LSO's activities at its 1996 convention in San Diego, which had led to the imposition of sanctions against a San Diego licensee.

gested that the exhibition be moved to a tent area across the street from the Center, but LSO refused.[5] On July 23, 1997, Dunn notified LSO by letter that he had decided to bar the art exhibition from the Center because of fear that the Center would face sanctions from the Officials if the exhibition went on as planned. The Center sent an addendum to the original contract that called for relocating the exhibition to the tent area.

On July 28, 1997, LSO filed suit against ABC and several of its officials in federal district court seeking injunctive relief that would allow its 1997 exhibition to take place at the Convention Center. The following day, the district court issued a TRO forbidding the Officials from interfering with the art exhibition. The exhibition and trade show took place as scheduled at the Convention Center between July 31 and August 2, 1997. After the event, the district court vacated its order to show cause regarding a preliminary injunction.

Soon after that, LSO filed an amended complaint seeking declaratory relief, damages and injunctive relief under 42 U.S.C. § 1983. LSO sought damages and declaratory relief with respect to the Officials' alleged interference with its 1997 convention preparations. It sought injunctive and declaratory relief to prevent future interference by the Officials with the exhibitions and trade shows LSO intends to hold in the future.

Though the district court issued numerous orders, LSO appeals only some of them. First, it appeals the district court's orders holding that LSO lacked standing to seek injunctive and declaratory relief. Second, LSO objects to the district court's order granting summary judgment to the Officials on the ground of qualified immunity. Third, LSO objects to the district court's award of costs to the Officials. The Officials cross-appeal, objecting to the district court's award of fees to LSO with respect to the TRO.

**5.** LSO states that holding the exhibition in a tented area was not feasible for a number of reasons and that it would have had to cancel

## DISCUSSION

### I. *Standing*

#### A. *The District Court's Orders*

The district court, in its orders of September 22, 1997, and February 17, 1998, concluded that LSO lacked standing to seek prospective injunctive and declaratory relief, and therefore dismissed LSO's claims seeking this relief. The court relied on our decision in *Nelsen v. King County*, 895 F.2d 1248, 1254 (9th Cir.1990), in holding that LSO's claim for injunctive relief was "based upon speculative, future harm, rather than the requisite 'credible threat of future harm,'" and that LSO lacked standing because it had not demonstrated "a specific injury that will result from specific, imminent conduct of the Defendants." The court also found that future events were "too hypothetical" to support standing for declaratory relief. We review *de novo* the district court's decision that the LSO lacks standing. *See Abboud v. INS*, 140 F.3d 843, 847 (9th Cir.1998).

#### B. *Discussion*

 Under Article III of the Constitution, a federal court lacks jurisdiction unless the plaintiffs present an actual "case or controversy." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). To satisfy this requirement, plaintiffs must have, *inter alia*, standing. *See American–Arab Anti–Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 506 (9th Cir.1991). As the party seeking to invoke federal jurisdiction, LSO bears the burden of establishing its standing. *See San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir.1996). To do so, it "must demonstrate three elements constituting the 'irreducible constitutional minimum' of Article III standing." *Id.* First, LSO must show that it has suffered an "'injury-in-fact' to a legally protected interest that is both 'concrete and particularized' and 'actual and imminent,'

the exhibition if it had been unable to hold it inside the Center.

as opposed to 'conjectural' or 'hypothetical.'" *Id.* Second, it must show a causal connection between the injury and the conduct complained of. Third, it must be "likely"—not merely speculative—that its injury will be "redressed by a favorable decision." *See id.*

■ Here, the controversy turns on whether LSO has alleged an injury-in-fact.

### 1. *Whether LSO alleges a "generalized grievance"*

■ The Officials argue that, since the regulatory threats at issue were directed at liquor licensees and not LSO itself, LSO alleges a generalized grievance and not a particularized injury. It is, of course, well settled that a party with a generalized grievance about government conduct lacks standing to sue. *See Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 475–76, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). We conclude, however, that this is not such a case.

In so doing, we are guided by the Supreme Court's decision in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). In *Bantam*, four New York book publishers sued the State of Rhode Island to challenge the practices of a state commission created to "educate" the public concerning literature it considered to be obscene or corrupting. *See id.* at 59–61, 83 S.Ct. 631. The commission had established a practice of notifying book distributors on its official stationery whenever books or magazines sold by the distributors were found objectionable by the commission. *See id.* at 61, 83 S.Ct. 631. The notice typically contained a reminder to the distributor of the commission's duty to bring purveyors of obscenity to the attention of the Attorney General.

*See id.* at 62, 83 S.Ct. 631. The particular bookseller involved in the *Bantam* case would then immediately stop distributing the listed publications, refuse to fill orders for the books, retrieve unsold copies already in bookstores, and return unsold copies to the publishers. *See id.* at 63, 83 S.Ct. 631. The distributor testified that he cooperated with the commission in order to avoid "some sort of a court action." *Id.*

Even though the actions of Rhode Island were directed at the distributors and not the publishers, the Court harbored no doubts concerning the publishers' standing to bring suit. The Court explained that, even though the commission's letters were sent to distributors and not publishers, and the commission did not purport to regulate the publishers, the publishers had suffered a "palpable injury" because circulation of their books was impaired. *Id.* at 64 n. 6, 83 S.Ct. 631. The Court emphasized that the publishers did not stand as "mere proxies arguing another's constitutional rights," because the publishers had a right to circulate their books and this right was implicated by the commission's activities. *Id.* Finally, the Court noted that pragmatic considerations played a role in its standing inquiry, because a book distributor prevented from selling a few titles would probably not suffer enough economic harm to justify suing, while a publisher would. *See id.* The Court concluded that "[u]nless [the publisher] is permitted to sue, infringements of freedom of the press may too often go unremedied." *Id.*

■ Here, the facts, and the policies implicated, are very similar to those in *Bantam*. LSO contends that the Officials censored its art exhibition by applying pressure and threats to a necessary conduit: the licensees whose facilities LSO must rent in order to hold its shows.[6]

---

6. LSO maintains that it has always held its conventions at convention centers because "they are the only facilities equipped to handle the convention, including the Art Exhibition and Trade Show." It further states that every site at which it has held its annual convention has had a liquor license and that it is aware of no site in California that has the capacity or facilities to host its convention that is not licensed.

Clearly LSO's standing is not defeated by the possibility that it could secure venues for its shows outside the State of California. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised

Thus, LSO alleges injury to its own constitutional rights. Moreover, like the book distributors in *Bantam*, none of the licensees involved in this case would be likely to litigate this issue simply because it is prevented from hosting a convention event or two.

We are not persuaded by the Officials' attempt to distinguish *Bantam Books* on the ground that the publishers in that case had suffered an actual injury-lost book sales-while LSO "never suffered an injury" because it ultimately was able to hold its 1997 convention. LSO points out that it incurred various costs arising from the Officials' alleged interference with the 1997 convention, notwithstanding the fact that the convention was finally held. Moreover, it alleges that the prospect of future interference by the officials burdens its First Amendment rights. Given the particularized nature of the harms alleged, we do not believe the instant case is distinguishable from *Bantam Books*. Thus, we hold that LSO's claim does not allege a generalized grievance.

### 2. *Whether LSO faces a realistic threat of future interference*

Next we consider whether LSO lacks standing because its concerns regarding future actions by the Officials are speculative or hypothetical. *See San Diego Gun Rights Comm.*, 98 F.3d at 1126. We conclude that LSO's pleadings were sufficient to overcome a motion to dismiss under Rule 12.

■■■ "The difference between an abstract question and a 'case and controversy' is one of degree, of course, and is not discernible by any precise test." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Nonetheless, some general principles exist. The Supreme Court and

this court have often emphasized that, when plaintiffs seek to establish standing to challenge a law or regulation that is not presently being enforced against them, they must demonstrate "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.* at 298, 99 S.Ct. 2301;[7] *Bland v. Fessler*, 88 F.3d 729, 736–37 (9th Cir.1996). In making standing determinations in such cases, we are cognizant of the fact that several unpredictable factors may determine whether an actual controversy involving the plaintiff and the challenged law will ever come about. As Justice Brennan explained in the context of a threatened criminal prosecution:

> Because the decision to instigate a criminal prosecution is usually discretionary with the prosecuting authorities, even a person with a settled intention to disobey the law can never be sure that the sanctions of the law will be invoked against him. Further, whether or not the injury will occur is to some extent within the control of the complaining party himself, since he can decide to abandon his intention to disobey the law. For these reasons, the maturity of such disputes for resolution before a prosecution begins is decided on a case-by-case basis, by considering the likelihood that the complainant will disobey the law, the certainty that such disobedience will take a particular form, any present injury occasioned by the threat of prosecution, and the likelihood that a prosecution will actually ensue.

*Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 143 n. 29, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

■■■ It is clear that a plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." *Id.* at 143, 95 S.Ct. 335. It is suf-

---

in some other place." *Schneider v. New Jersey*, 308 U.S. 147, 151–52, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

**7.** Although *Farm Workers* involved a challenge to the constitutionality of a criminal statute by an individual faced with the possi-

bility of criminal prosecution, this court has applied its reasoning to a case involving a constitutional challenge to a civil statute. *See Bland v. Fessler*, 88 F.3d 729, 736–37 n. 11 (9th Cir.1996).

ficient for standing purposes that the plaintiff intends to engage in "a course of conduct arguably affected with a constitutional interest" and that there is a credible threat that the challenged provision will be invoked against the plaintiff. *See Farm Workers*, 442 U.S. at 298, 99 S.Ct. 2301. By contrast, "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris*, 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

▪ In considering whether a plaintiff faces a realistic threat, we consider a variety of factors. It is well settled that evidence of past instances of enforcement is important in a standing inquiry. *See San Diego Gun Rights Comm.*, 98 F.3d at 1128 (noting absence of any past prosecutions under the challenged provision and finding lack of standing); *American–Arab*, 970 F.2d at 507 (noting past prosecution of plaintiffs under challenged provision and finding standing).

However, enforcement history alone is not dispositive. Courts have found standing where no one had ever been prosecuted under the challenged provision. *See Farm Workers*, 442 U.S. at 302, 99 S.Ct. 2301; *see also Bland*, 88 F.3d at 737. Conversely, we also have explained that evidence of past prosecution is not sufficient to gain standing "if unaccompanied by any continuing, present, adverse effects." *American–Arab*, 970 F.2d at 507. Thus, we could not automatically conclude that LSO has standing simply because the Officials interfered with their convention plans in 1997.

Courts have also considered the Government's failure to disavow application of the challenged provision as a factor in favor of a finding of standing. *See, e.g., Farm Workers*, 442 U.S. at 302, 99 S.Ct. 2301 (noting the Government's failure to disavow application of the challenged provision against parties like plaintiffs, and concluding that plaintiffs "are thus not without some reason in fearing prosecution"); *Bland*, 88 F.3d at 737 ("The Attorney General of California has not stated affirmatively that his office will not enforce the . . . statute."); *American–Arab*, 970 F.2d at 508 (noting that Government dropped charges against plaintiff "not because they were considered inapplicable, but for tactical reasons.")

The Officials have not disavowed their intent to impose sanctions if the exhibit is held on licensed premises. While we cannot go so far as to say that a plaintiff has standing whenever the Government refuses to rule out use of the challenged provision, failure to disavow "is an attitudinal factor the net effect of which would seem to impart some substance to the fears of [plaintiffs]." *Id.*

▪ Finally, when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing. Thus, when the State of Virginia passed a law banning the display of certain sexually-explicit material where juveniles could examine it, the Supreme Court found that booksellers had standing to object, even though the law had not yet been enforced. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 386, 392–93, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). The Court explained:

> We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without actual prosecution.

*Id.* at 393, 108 S.Ct. 636. Accordingly, we have noted that the tendency to find standing absent actual, impending enforcement against the plaintiff is stronger "in First Amendment cases, '[f]or free expression-of transcendent value to all society, and not merely to those exercising their rights-might be the loser." *Bland*, 88 F.3d at 736-37 (quoting *Dombrowski v. Pfister*,

380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)). *Accord Navegar, Inc. v. United States,* 103 F.3d 994, 999 (D.C.Cir.1997) ("Federal courts most frequently find preenforcement challenges justiciable when the challenged statutes allegedly 'chill' conduct protected by the First Amendment.").

Here all of the salient factors point to a finding of standing. LSO has demonstrated a realistic threat that the Officials again will wield Section 143.4 in a manner infringing upon LSO's constitutional rights. It appears from the record and the briefs that ABC enforced or threatened to enforce Section 143.4 against licensees involved with LSO's conventions in 1996 and 1997.[8] LSO asserts in its pleadings on information and belief that ABC has in the past conducted raids on licensed premises and forced the removal of art it believes conflicts with its regulations. LSO has indicated that it intends to hold erotic art exhibitions annually in the future. Finally, LSO pleads that the possibility that the Officials will again apply the regulations in a way that could deny it a venue inhibits it from planning future conventions in California, thus chilling its freedom of expression within the state.[9] Indeed, LSO has already engaged in self-censorship. It indicated in its pleadings that it canceled plans to show some of the art from the 1997 exhibition elsewhere in California because of the Officials' posture regarding Section 143.4.

■ We are not persuaded by the Officials' contention that LSO was required to plead that a particular ABC licensee had in fact refused to lease premises to LSO for a particular exhibition or trade show, and that it did so because of fear of ABC sanctions. It was sufficient for LSO to plead, as it did, that the threat of enforcement of Section 143.4 was likely to impede LSO's ability to find venues for future exhibitions and trade shows within California. We think it follows logically from LSO's pleadings that few, if any, businesses will be willing to risk their liquor license in order to do business with LSO, and that this state of affairs burdens LSO's freedom of expression. Moreover, LSO needed only to plead that the threat of enforcement stood as *one* barrier to the exercise of its First Amendment rights. It was not required to show that Section 143.4 was the only barrier to finding a venue in California or that LSO would, in fact, find a venue within California but for the threat of enforcement. *See Northeastern Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). A plaintiff needs only to plead general factual allegations of injury in order to survive a motion to dismiss, for "we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quotations omitted). Finally, we note that our finding of a reasonable threat of prosecution, for standing purposes, dispenses with any ripeness problem. *See Adult Video,* 960 F.2d at 786.

Accordingly, we reverse the district court's orders dismissing LSO's claims seeking prospective relief and remand for further proceedings.[10]

---

8. Indeed, the Officials maintain before this court that they are not free under the California Constitution to decline to enforce a statute on constitutional grounds if the statute in question has not been struck down by an appellate court. *See* Part II, *infra.*

9. The district court expressed the view that an order restricting the Officials' future conduct with respect to LSO conventions might permit LSO to exhibit legally obscene art. We think such concerns can be addressed with a carefully and narrowly worded order.

10. *Nelsen v. King County,* 895 F.2d 1248 (9th Cir.1990), upon which the district court relied, does not control here because it dealt with a situation "where the litigant's claim relie[d] upon a chain of speculative contingencies ... that include[d] the violation of an unchallenged law." *Id.* at 1252. The Supreme Court and our circuit have generally found a lack of standing in cases where plaintiffs would not be subject to the challenged law unless they violated an unchallenged law. *See id.* This case does not present such a situation.

## II. Qualified Immunity

### A. The District Court's Orders

 With respect to LSO's claim for damages, the district court granted summary judgment to the Officials on the basis of qualified immunity. The court reasoned that because the U.S. Supreme Court's decision in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), was ambiguous and because the California Constitution prohibits state officials from refusing to enforce a law on constitutional grounds unless an appellate court has struck down the law,[11] a reasonable official might not have understood that the Officials' actions violated LSO's rights. We review *de novo* a district court's decision to grant summary judgment on the ground of qualified immunity. *See Blueford v. Prunty*, 108 F.3d 251, 253 (9th Cir.1997).

### B. Discussion

 State officials are entitled to qualified immunity in performing discretionary functions if their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were "clearly established." *See Shoshone–Bannock Tribes v. Fish & Game Comm'n*, 42 F.3d 1278, 1285 (9th Cir.1994). If that burden is satisfied, the defendant must prove that his conduct was "reasonable." *See id.*

 "[T]he first step [in qualified immunity analysis] is to identify the exact contours of the underlying right said to be violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n. 5, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998). "[I]t is only then that a court should ask whether the right allegedly implicated was clearly

established at the time of the event in question." *Id.*

 Thus, a qualified immunity determination involves three inquiries: (1) identification of the right that has allegedly been violated, (2) the determination of whether that right was clearly established such that a reasonable official would have known of it, and (3) the determination of whether a reasonable officer would have believed that the challenged conduct was lawful. *Shoshone–Bannock Tribes*, 42 F.3d at 1285. "The first two questions are issues of law; the third, although ultimately a legal question, may require fact finding as well." *Id.* at 1285–86.

#### 1. The contours of the right allegedly violated

 In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court observed that the outcome of the "clearly established rights" inquiry in each case "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *See id.* at 639, 107 S.Ct. 3034. The Court directed that the inquiry into whether rights were clearly established should be conducted in a "particularized" manner, rather than a general one. *See id.* at 640, 107 S.Ct. 3034. This court followed that directive in *Camarillo v. McCarthy*, 998 F.2d 638 (9th Cir.1993), in which an HIV-positive prison inmate argued that being separated from the general prison population violated his rights to freedom of association under the First Amendment. *See id.* at 640. We concluded that the proper question was not whether the First Amendment was clearly established, but whether it was clearly established that "inmates [were] entitled to be free from prison regulations that restrict their association with members of the general prison population." *Id.*

Not surprisingly, the parties propose rather different formulations of the right at issue in this case. LSO contends that

---

11. *See* Cal. Const. art III, § 3.5(a).

the right at issue is "the right to be free from content-based discrimination." The Officials state that the issue is whether there was law clearly establishing that they "would violate LSO's freedom of expression by advising LSO of the existence of the ABC regulations, and further advising that said regulations apply to conduct on ABC-licensed premises."

LSO's proposed formulation is too general, for as we have said, "the right referenced by the [qualified immunity] test is not a general constitutional guarantee ... but its application in a particular context." *Todd v. United States*, 849 F.2d 365, 370 (9th Cir.1988). Likewise, the Officials' formulation is too particularized. To phrase the "right allegedly violated" in such detail and in terms so closely paralleling what allegedly happened here "would be to allow [the Officials], and future defendants, to define away all potential claims." *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir.1995).

Our goal is to define the contours of the right allegedly violated in a way that expresses what is really being litigated. In this case we are not called upon to decide if, in 1997, the Government generally had the power to censor speech based on content, or whether an official generally could inform someone of the existence of a particular state law without violating the First Amendment. Indeed, the Officials here do not seriously dispute that content-based regulation of expression by the Government, even of indecent expression, is prohibited unless necessary to meet a compelling government interest, *see e.g., Sable Communications v. F.C.C.*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), or that prior restraint of speech is strongly disfavored and rarely upheld, *see, e.g., Southeastern Promotions,*

*Ltd. v. Conrad,* 420 U.S. 546, 558–59, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Collins v. Jordan,* 110 F.3d 1363, 1372 (9th Cir. 1996). Nor does LSO contend that its rights were violated merely because the Officials "informed" them of the content of Section 143.4. Instead, the Officials argue that they could reasonably have believed in 1997 that liquor regulations were subject to an exception to the general rules of the First Amendment, such that LSO's right to display artwork that violated Section 143.4 on the premises of an ABC licensee was questionable. Thus, we are asked to decide whether, under the circumstances, it was clear that LSO had the right to exhibit non-obscene art on the premises of an ABC licensee free of interference from state officials, even though some of the art fell within the proscriptions of a state liquor regulation governing expressive content at licensed establishments.

## 2. *Whether the law was clearly established*

The Officials contend that in 1997 there was some question as to whether liquor authorities could constitutionally regulate the content of expression, including non-obscene expression, on the premises of establishments holding liquor licenses. They argue that because the Supreme Court, in *44 Liquormart* did not explicitly disavow its earlier holding in *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), it was unclear whether Section 143.4 could be constitutionally employed to punish the display of non-obscene art. We disagree.

In *LaRue*, the Supreme Court upheld against a facial challenge the California regulations that were precursors to today's Section 143.4.[12] *See id.* at 118–19, 93 S.Ct.

---

12. The regulations prohibited, *inter alia:*

(a) The performance of acts, or simulated acts, of "sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation or any sexual acts which are prohibited by law";

(b) The actual or simulated "touching, caressing or fondling on the breast, buttocks, anus or genitals";

(c) The actual or simulated "displaying of the pubic hair, anus, vulva or genitals";

(d) The permitting by a licensee of "any person to remain in or upon the licensed premises who exposes to public view any portion of his or her genitals or anus"; and, by a companion section,

(e) The displaying of films or pictures depicting acts a live performance of which

390. These regulations were enacted partly in response to live sex shows and sexual contact between nude performers and patrons. *See id.* at 111, 93 S.Ct. 390. While acknowledging that some of the regulated conduct fell "within the limits of the constitutional protection of freedom of expression," the Court nonetheless concluded that such regulation was permissible because of the "critical fact" that the rules applied only in establishments licensed to sell liquor. *See id.* at 118, 93 S.Ct. 390. Explicitly, the Court stated that the Twenty-first Amendment required an "added presumption in favor of the validity of state regulation in this area." *Id.* at 118–19, 93 S.Ct. 390.

The Court in *44 Liquormart* revisited *LaRue* and concluded that "the Court's analysis in *LaRue* would have lead to precisely the same result if it had placed no reliance on the Twenty-first Amendment." 517 U.S. at 515, 116 S.Ct. 1495. This was because the state could have prohibited "the kind of 'bacchanalian revelries' described in the LaRue opinion" by invoking its general police powers and without resorting to the Twenty-first Amendment. *Id.* The Court stated that while it was not questioning the holding in *LaRue,* it was disavowing "its reasoning insofar as it relied on the Twenty-first Amendment." *Id.* at 516, 116 S.Ct. 1495. It concluded by holding that "the Twenty-first Amendment does not qualify the constitutional prohibition against laws abridging the freedom of speech embodied in the First Amendment." *Id.*

The Officials argue that because the Supreme Court did not disavow the actual holding of *LaRue,* it was not clear that the ABC regulations were invalid. However, the Court made clear in *44 Liquormart* that the Twenty-first Amendment does not authorize states to enact liquor regulations that would otherwise be prevented by the First Amendment in other contexts. *See id.*

The Court decided *44 Liquormart* on May 13, 1996. *See id.* at 484, 116 S.Ct. 1495. The incidents in question here occurred in 1997. Thus, at the time that the Officials warned the Center's management that hosting LSO's art exhibition might subject the Center to sanctions, it was clearly established that liquor regulations could not be used to impose restrictions on speech that would otherwise be prohibited under the First Amendment. Thus, LSO's right was "clearly established."

3. *Whether a reasonable official could have believed that the conduct of the Officials was lawful*

■■■ The remaining question is whether reasonable people in the Officials' position could have believed that their conduct was lawful. The officials argue that, even if it was clear in 1997 that applying Section 143.4 to deny LSO a venue for its exhibition was unconstitutional, they were nonetheless required to enforce the regulation because of Article III, Section 3.5, Subdivision (a), of the California Constitution. This provision states that an administrative agency has no power to "refuse to enforce a statute[ ] on the basis of it being unconstitutional, unless an appellate court has made a determination that such statute is unconstitutional." Cal. Const. art. III, § 3.5(a).[13] Thus, the Officials contend, since no appellate court had yet struck down Section 143.4, they could have reasonably thought that they were required to enforce the law.

■■■ This argument, however, takes no account of the Supremacy Clause of the

---

was prohibited by the regulations quoted above. Rules 143.3 and 143.4. *LaRue,* 409 U.S. at 111, 93 S.Ct. 390.

**13.** The purpose of this amendment, enacted by the voters of California in 1978, "was to prevent agencies from using their own interpretation of the Constitution or federal law to thwart the mandates of the Legislature." *Reese v. Kizer,* 46 Cal.3d 996, 251 Cal.Rptr. 299, 760 P.2d 495, 499 (Cal.1988). The Officials, perhaps not surprisingly, cite no decisions in which Section 3.5(a) has been held to shield state officials from liability for infringing on federal rights, nor have we found any.

United States Constitution. It is a long-standing principle that a state may not immunize its officials from the requirements of federal law. *See Martinez v. California*, 444 U.S. 277, 284, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). To adopt the Officials' contention would be to eliminate *any* obligation on the part of state officials to draw even the most obvious conclusions from well-settled federal case law until the *precise* state law at issue is struck down. Such a result would be untenable. "Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law.... [T]he supremacy clause of the Constitution insures that the proper construction may be enforced." *See id.* at 284 n. 8, 100 S.Ct. 553 (quoting *Hampton v. Chicago*, 484 F.2d 602, 607 (7th Cir. 1973)).

The Officials cite *F.E. Trotter, Inc. v. Watkins*, 869 F.2d 1312, 1315 (9th Cir. 1989), for the proposition that "[g]overnment officials are not 'charged with predicting the future course of constitutional law.'" However, the Officials ignore another statement from the same case: "The very action in question need not have previously been held unlawful, but in light of existing law, its unlawfulness must be apparent." *Id.* Here, there was no need for the Officials to predict future developments in constitutional law because *44 Liquormart* made clear that state liquor regulations are subject to the First Amendment just like any other state enactments.

We conclude that in 1997 no reasonable official could have believed that Section 143.4 could constitutionally be employed to impede LSO's right to display non-obscene art on the premises of an ABC licensee. Thus, we reverse the district court's grant of summary judgment to the Officials on the ground of qualified immunity.

## III. *Fees and Costs*

### A. *The District Court's Orders*

The Officials appeal from the district court's order entered on July 7, 1998, awarding attorney's fees to LSO with respect to the TRO. The district court reasoned that because LSO obtained a TRO and therefore was able to hold its 1997 convention, it was the "prevailing party" with respect to the TRO for the purposes of a fee award under 42 U.S.C. § 1988(b). The district court also found that the Officials were the prevailing party on the other claims raised by LSO and awarded them costs. LSO appeals this award.

 We review the district court's award of fees pursuant to 42 U.S.C. § 1988 for abuse of discretion. *See Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir.1997). We also review an award of costs for abuse of discretion. *See EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir.1997).

### B. *Discussion*

 A party "prevails" for the purposes of a fee award if it succeeds "on any significant issue in litigation which achieves some of the benefit [it] sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "[T]o be considered a prevailing party within the meaning of § 1988, the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). "[P]laintiffs seeking to qualify as 'prevailing parties' [must] establish some sort of clear, causal relationship between the litigation brought and the practical outcome realized." *American Constitutional Party v. Munro*, 650 F.2d 184, 188 (9th Cir.1981).

 The Officials contend that obtaining a TRO alone does not qualify one for "prevailing party" status. As authority for this assertion, they cite to decisions from three other circuits. The officials misread these cases.

In *Bisciglia v. Kenosha Unified Sch. Dist. No. 1*, 45 F.3d 223 (7th Cir.1995), the

court held that obtaining a TRO alone does not constitute prevailing on the merits where the TRO did *no more than preserve the status quo. See id.* at 230–31. The other cases cited by the Officials also invoked a test based on whether the status quo had been changed. *See Bly v. McLeod,* 605 F.2d 134, 137 (4th Cir.1979) (holding that party obtaining TRO was not a "prevailing party" because the particular TRO in question only preserved the status quo); *Paragould Music Co. v. City Paragould,* 738 F.2d 973, 974 (8th Cir.1984) (same).

It is clear that the TRO in this case did more than preserve the status quo. Here, the district court correctly noted that LSO was the prevailing party with respect to the TRO because the TRO allowed the convention and art exhibition to take place. It explained that "[t]he legal relationship between the Defendants and LSO was legally altered because the TRO prevented the Defendants from further interfering with the Art Exhibition." Thus, the district court did not abuse its discretion in awarding fees to LSO.

Because we reverse the district court's rulings in favor of the Officials on several of the claims contained in LSO's amended complaint, a new determination of "prevailing party" status with respect to these claims will have to be made at the conclusion of the proceedings on remand. Thus, we do not reach LSO's appeal of the district court's decision awarding costs to the Officials.

## CONCLUSION

We reverse the district court's dismissal of LSO's demands for prospective relief on standing grounds and its grant of summary judgment to the Officials on the grounds of qualified immunity. We affirm the district court's award of fees to LSO for services related to obtaining the TRO. We remand for further proceedings consistent with this opinion.

REVERSED in part, AFFIRMED in part, and REMANDED.

Costs to Appellant LSO, Ltd.